**SO ORDERED.**

**SIGNED this 31st day of May, 2017.**



_____
Janice Miller Karlin
United States Chief Bankruptcy Judge

_____

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In re:

Ronald L. Coppaken
Denise R. Coppaken,

          Debtors.
_____

Holley Performance Products, Inc.,

          Plaintiff,

vs.

Ronald L. Coppaken and
Denise R. Coppaken,

          Defendants.
_____

Case No. 16-20079-7

Adversary No. 16-6048

**Memorandum Opinion**
**Granting in Part Creditor's Objection to Debtors' Homestead Exemption,**
**Granting Judgment to Creditor on its §§ 727(a)(2) and (a)(4)(A) Claims,**
**and Denying Creditor's Claim under § 727(a)(5)**

The creditor's claims in this case are not unusual: Creditor Holley

Performance Products, Inc. (hereafter "Creditor") objects to Debtors' homestead

exemption claim under 11 U.S.C. § 522(o)(4),[1] alleging that Debtors/Defendants Ronald ("Ron") and Denise Coppaken[2] obtained equity in their homestead with the "intent to hinder, delay, or defraud" it. Creditor also seeks a determination that Debtors are not entitled to a discharge (under §§ 727(a)(2), (a)(4)(A), and (a)(5)) because they transferred assets with the intent to hinder, delay, or defraud it, made false oaths in connection with their bankruptcy, and failed to satisfactorily explain the deficiency of their assets.

But the facts surrounding these claims are dense and difficult to follow. Although the Court will detail them below, it will also attach an abbreviated time line as Exhibit A because the order of events, and their proximity to one another in some instances, is revealing. Here is the overall summary:

> Debtor grows business over 30 years and gets wealthy; Debtor loses business notwithstanding using personal wealth (and guarantees) to try to save business. Creditor pursues Debtor (off and on) to collect on judgment. Debtor obtains $1.5M settlement from unrelated litigation and purposely structures his receipt so Creditor can't reach it, dumping almost $1M into his luxury home. Debtor starts new business (which cannot support his prior lifestyle); son joins him and both switch to more profitable business. Debtors file bankruptcy (and makes several false statements therein). Debtor transfers new business to son for essentially nothing after filing bankruptcy, but tries to make it look like the transfer occurred prepetition. Debtors continue to hide the ball from Creditor, and Creditor cries fowl.

Interestingly, the parties don't really dispute the facts, having stipulated to

---

[1] All future statutory references are to the Bankruptcy Code, title 11 of the United States Code, unless otherwise specified.

[2] Debtors/Defendants will hereafter be referred to jointly as Debtors or singly by their first names, to distinguish them from their sons, Todd and Jeff Coppaken.

2

most of them,[3] but they do vigorously advocate different interpretations of those facts. After carefully observing the demeanor and credibility of the witnesses, and sifting through all the facts, the Court can see only one interpretation: that Debtors acted fraudulently to hide cash and build equity in their home, to transfer an asset postpetition, and to hide assets and income in their petition.

Ultimately, the Court grants Creditor's objection to Debtors' homestead exemption as to Ron's interest in his homestead,[4] grants judgment to Creditor on its claims under §§ 727(a)(2) and (a)(4)(A), and denies Creditor's § 727(a)(5) claim.[5]

## I.    Findings of Fact

### A.    The Early Years—Debtor Builds a Business, but it Collapses

Debtors married in 1974, a year after Ron began work at his uncle's specialty wholesale auto parts business—Arrow Speed Warehouse ("Arrow"). By the time Ron purchased Arrow from his uncle in 1985 and became its CEO, Arrow's annual revenues had grown from $1 million to $10 million. Ron then grew the business to $85 million in annual revenues over the next 30 years.

In 1996, Debtors built their home for $800,000 and it is, by any standard, a luxury asset. It sits on almost an acre, has 5,980 square feet living area above grade and 3,759 square feet below grade, and includes five bedrooms and four bathrooms,

---

[3] The Court's findings of fact are taken from the parties' Joint Stipulation (Doc. 96 in Adv. No. 16-6048), from witness testimony, and from trial exhibits.

[4] Case No. 16-20079 Doc. 44.

[5] Adv. No. 16-6048 Doc. 1.

two kitchens, three fireplaces, an elevator, and two garages that can hold 6 cars. It also has an outdoor space that includes three decks, a salt water pool, and a changing room. The most recent appraisal, from 2013, reflected a $1.28 million value, and Debtors told Creditor (in a September 2015 financial statement) that it was then worth $1.3 million.

Debtors have three grown children, including two sons, Todd and Jeff, who each play a role in this case. Denise, who testified she was never an owner of any of Ron's business ventures (despite evidence to the contrary),[6] generally took care of Debtors' home and family life, and Ron took care of the financial and business parts of their lives. Denise did "gopher" work for at least two of these businesses, but not full time or regularly.

Todd came to work at Arrow in 2001 and Jeff in 2003. At its peak in the mid-2000s, Arrow had seven locations in the Midwest and about 320 employees. Although Arrow's industry began a decline in 2005, Arrow stayed afloat until the entire economy entered a recession in 2007 because it had at least one large supply contract. Ron hoped to ride out the decline by infusing cash into the business to pay vendors and keep supply lines open, and over some period of time, Debtors injected

---

[6] Debtors' Statement of Financial Affairs, Exh. 10, p.14, Question 27 (regarding BCGG Real Estate Co. ("BCGG")), states "Debtors have . . . been the sole owners since August, 1985." Debtors' Schedule A/B Property, Exh. 10, p.23, Question 42, states Ron is a 2/3 and Denise a 1/3 owner, respectively, of BCGG. Denise's statement also conflicts with reports Ron filed under penalty of perjury with the Kansas Secretary of State, which show that both he and Denise were the sole members of Image Truck Partners, LLC in 2014 and 2015. *See* Exhs. 63 and 99, Image Truck Partners Limited Liability Company Annual Report.

4

about $3.8 million into Arrow. Some of this came from loans secured by mortgages on their home. As a result, Debtors' net worth dropped significantly.

Ultimately, Ron couldn't continue the business, and he began negotiating Arrow's sale to the industry leader—Keystone Operations, Inc. ("Keystone"). As a condition of the sale, however, Keystone required that Arrow file a Chapter 11 bankruptcy, which it did in 2008.

Keystone became a stalking horse bidder and purchased Arrow's assets out of bankruptcy in November 2008. Part of Ron's negotiations with Keystone included employment contracts for himself, Todd, and Jeff, and the plan was for the three of them to work for Keystone after the asset sale. But immediately prior to the closing of the sale, Keystone informed Ron that it would not honor Ron's employment contract. About a year later, Ron sued Keystone for alleged breach of an employment contract.

Debtors' adversarial relationship with Creditor goes back to this period. Debtors had personally guaranteed a loan Creditor gave to Arrow, and upon default, Creditor demanded payment. Ron attempted to settle the dispute by offering a return of inventory, but Creditor refused because Arrow was already in bankruptcy by that point and the inventory offered was an asset of the Arrow bankruptcy estate.

In October 2008, Creditor sued Debtors to collect on that guarantee. The court ultimately awarded summary judgment to Creditor for $317,891, plus $128,595 in attorney fees and $7,469 in costs, with interest at 12% per annum.

5

Before final judgment was entered in 2010, Ron again attempted to settle the debt with a July 2009 settlement offer. This time he offered to turn over five used vehicles he valued at $77,000. Creditor did not accept. Debtors have made no payments on this debt, although they have never disputed the validity of the judgment.

### B. Post-Arrow Bankruptcy and Debtors' Personal Continuing Fallout in 2011 and 2012

Out of work as a result of Keystone's rescission of its employment offer, Ron formed Image Motors in June 2010; it was an automobile brokerage company specializing in high-end used luxury vehicles. When the business was formed, Ron's silent partner (Scott Krigel) injected an unknown amount of cash in exchange for his 1% ownership interest, but he never had ownership responsibilities for Image Motors, never worked at Image Motors, and never received any income from Image Motors.

About a year after Ron formed Image Motors, on September 1, 2011, Creditor conducted a debtor's examination of Ron to seek information of possible sources for collection of its judgment. Ron disclosed his pending employment contract lawsuit against Keystone, which Creditor already knew about because one of its principals, Steven Nikitas, had learned of it while sitting on Arrow's unsecured creditors' committee. By this time, Debtors had also defaulted on notes secured by a first and second mortgage on their home. The first mortgage holder, Chase, was sending demand letters and the second mortgage holder, M&I Bank, commenced foreclosure

6

in October, 2011.

By early 2012, and possibly even earlier, Ron had disclosed these problems to Scott Slabotsky, someone Debtors consider a lifelong personal friend. Mr. Slabotsky was (and is) the lead managing director of a tax and auditing firm, CBIZ MHM, LLC (hereinafter "CBIZ"), has been licensed as a CPA for over forty years, and also served as Debtors' personal and business accountant for over thirty years.

Mr. Slabotsky agreed to help Debtors, at Ron's request, buy out the second mortgage held by M&I Bank, because Mr. Slabotsky had some connections with M&I Bank's management. Ron thought it would be "better" for Mr. Slabotsky to coordinate the purchase instead of Ron because of those connections. The proposed purchaser was to be GTMI, LLC, a business entity owned by Michael Gortenburg.

Mr. Gortenburg is not a personal acquaintance, client, or business associate of Mr. Slabotsky, but is instead another lifetime friend of Ron's. Mr. Gortenburg is a very wealthy, self-employed nationwide developer of multi-family real estate projects. He has loaned money to Ron, both personally and for his businesses (and to Todd and his business), numerous times over the years, and forthrightly testified both that he hopes Ron and Denise rebound from their financial difficulties and that he wants to help them succeed.

When Mr. Slabotsky began to negotiate GTMI's purchase of Debtors' second mortgage, he was not only aware of the Keystone litigation—as he had assisted Ron in providing a valuation of damages, but by January 17, 2012, he was also aware that Ron was in settlement talks with Keystone. Here is the plan that Ron, Mr.

7

Gortenburg, and Mr. Slabotsky devised: Mr. Slabotsky would use his M&I Bank connections to negotiate the buy out of M&I Bank's note and mortgage at a heavily discounted price, M&I Bank would then assign its entire note and second mortgage to GTMI, and when Ron reached a settlement with Keystone, Ron would use so much of those funds as were needed to reimburse Mr. Gortenburg for his outlay. Mr. Slabotsky testified that he knew Mr. Gortenburg might ultimately buy out both the first and second mortgages on Debtors' residence with those settlement proceeds.

Without disclosing to his M&I Bank contacts who his "partners" were in the deal—actually only Mr. Gortenburg through GTMI—Mr. Slabotsky ultimately persuaded M&I Bank, on January 25, 2012, to sell its interest (at a time when Debtors owed it $698,611) to GTMI for the significantly discounted price of $254,000. At this point, Debtors owed Chase, on its first mortgage, approximately $670,000, against a fair market value for the house of approximately $1.2 million. This meant there was likely over $275,000 in equity in the house to protect GTMI's investment.

Notwithstanding this equity, Mr. Gortenburg testified that he had "some nervousness" about recouping his $254,000 payment because he knew of the existence of Chase's large first mortgage. But contrast that testimony with him originally labeling his $254,000 outlay "pocket change" (at his deposition), and then modifying that description to say his loss of $254,000 would not be "life-altering," since he usually focuses on "big money" deals. And ask whether this story makes

8

sense, given that even if Ron failed to pay Chase its first mortgage—which he said he trusted Ron 100% to do, Mr. Gortenburg still had the $275,000 equity cushion in Debtors' home.

The assignment of M&I Bank's second mortgage to GTMI was finalized on February 13, 2012. While Mr. Gortenburg claims not to remember whether he knew when he bought the M&I Bank mortgage that Ron expected to soon receive a significant settlement from Keystone, he did admit Ron told him this fact at some point in time. Mr. Gortenburg's agent for the M&I Bank purchase, Mr. Slabotsky, certainly knew at least a month before the purchase that Ron was in settlement talks. Further, Ron formally assigned up to $1.2 million of his anticipated Keystone proceeds to GTMI on March 13, 2012, just a few weeks after GTMI bought out M&I Bank's mortgage. Ron also gave GTMI a security interest in his settlement proceeds.[7] Only two weeks later, on March 27, 2012, Ron received a $1.5 million

---

[7] Contrast Mr. Gortenburg's decision to fully paper this $254,000 transaction with how he handled other loans or gifts he made to the Coppaken family. For example, in the first few months of Image Truck Partners' operation in 2014—another Coppaken entity discussed below—Mr. Gortenburg loaned "small amounts" of $20,000 to $40,000 without requiring any documentation, security, or interest. In May 2014, Image Truck Partners opened an account with Mission Bank, and took out a $250,000 line of credit—a line of credit that Ron and Todd had been unable to obtain elsewhere—for which Mr. Gortenburg pledged his own certificate of deposit. Todd testified that if Image Truck Partners needed funds in excess of that line of credit, he would simply call Mr. Gortenburg. Another example occurred on July 31, 2015, when Mr. Gortenburg loaned Image Truck Partners $672,000. Although this was more than double the $254,000 "loan" Mr. Gortenburg had made to buy out the M&I Bank mortgage three years earlier, and for which he required an assignment and a recorded security agreement, Mr. Gortenburg requested nothing be signed—no loan agreement or contract or security interest was requested for this $672,000 loan and no interest was charged. Mr. Gortenburg testified that he willingly and frequently loaned money to Image Truck Partners because of his friendship with Ron and that he does not charge interest or paper those loans because they are intended to be short term.

9

settlement in the Keystone litigation.

Thus, from the entirety of the evidence, the Court believes Mr. Gortenburg well knew that a settlement was probable and the likely range of that settlement when Mr. Slabotsky started the negotiations with M&I Bank in mid-January, and knew his risk was negligible due to the overall value of the house securing his mortgage (even if Ron never received any settlement). Since there was no real risk, the Court simply does not believe the only excuse offered—that Mr. Gortenburg wanted the deal structured this way—for Ron going through so many hoops to avoid receiving the settlement proceeds directly.

Now we turn our attention to that settlement. As it turns out, Ron was not the direct recipient of any of the $1.5 million settlement (despite his later testimony that he was). Although the original disbursement draft had all net proceeds being payable to Ron, that's not what ultimately happened. Instead, that draft was replaced and this is who actually received the money:

| | |
|---|---|
| GTMI | $927,620.24 |
| Evans & Mullinix (law firm that filed this bankruptcy and vigorously defended the M&I Bank foreclosure action) | $20,000.00 |
| CBIZ | $15,000.00 |
| BCGG | $20,000.00 |
| Total[8] | $982,620.24 |

---

[8] Exh. 28. Ron claims the $20,000 payable to Evans & Mullinix (again, a firm that specializes in bankruptcy work) was for legal bills already incurred and the $15,000 payable to CBIZ was a retainer for the preparation of future tax returns. No explanation was provided for why BCGG, a company Debtors own, received $20,000 or what it did with that money.

10

So what did GTMI do with all that money? Apparently nothing for almost three months, until June 20, 2012, when Ron asked Mr. Gortenburg to provide him a check for $672,523.87—the amount needed to pay off the first mortgage owed to Chase. GTMI apparently used the rest of Ron's settlement funds it was holding to reimburse Mr. Gortenburg for the $254,000 outlay to buy out M&I Bank's interest ($255,096.37). Thus, the amount Ron directed be paid to GTMI from the settlement proceeds was essentially identical to the amount needed to pay off the first mortgage and to pay GTMI the $254,000 it had paid to assume the second mortgage. Ron testified this was a mere coincidence, which the Court doubts.

Because Debtors had to realize this "coincidence" looked suspicious, and to try to justify why the net proceeds weren't simply deposited in Debtors' personal bank account, their counsel solicited from Mr. Gortenburg his rationale for funneling these settlement proceeds through his company. Mr. Gortenburg testified it was to "protect himself" on GTMI's $254,000 outlay, i.e. to be sure he would actually receive that money. This was his testimony even though he also testified he had "100%" trust in Ron to pay Chase directly, even though $254,000 was not a significant amount of money to him, and even though GTMI was protected with a mortgage on Debtors' home which had a fair market value exceeding $1.2 million. This story was not credible to the Court.

Also pertinent to this distribution scheme is the fact that although Mr. Gortenburg is Ron's lifelong friend, and although he was promptly repaid over 100% of his entire outlay for taking out the second mortgage on his lifelong friend's

11

home—and has not sought or collected interest on myriad other loans he has made to this family—he now contends he is still owed about $450,000 in principal on this (M&I Bank) debt plus interest accruing at 18%, or $80,000 per year. Ron testified at trial that he did not understand that Mr. Gortenburg had purchased the second mortgage with the goal or intent of making a profit off it by charging his friend that 18% interest and by collecting the full amount (plus interest) on the original M&I Bank note even though Mr. Gortenburg, himself, had not paid that balance to receive the assignment from M&I Bank.

More importantly, although Mr. Gortenburg testified this transaction was both for business and personal reasons, Mr. Gortenburg has not treated it as a business deal over the last five years. He has never requested (or received) repayment of this "debt" from Ron, has never attempted to collect it, and has never commenced foreclosure of the mortgage. It thus doesn't seem like it was for a business purpose, since no successful business person would allow a 5-year long default to endure without commencing foreclosure.

It seems obvious to the Court what is going on behind the surface here. If Mr. Gortenburg holds that $450,000 second mortgage, which is accruing $80,000 in interest accruing per year—even if he never intends to collect it from his lifetime friend, that mortgage, coupled with the balance owed on the first mortgage given to Sunflower Bank in 2013, consumes all the equity in the home. As a result, no Chapter 7 trustee or creditor would have a financial incentive to liquidate the home even if they could prove equity was created with the intent to hinder, defraud, or

12

delay. Again, this seems to have been the point of all of this.

Back to the timeline. The first public record that Holley could have seen, suggesting that the Keystone litigation had ended (and Ron could have possibly received some money it could use to collect its judgment) occurred on April 9, 2012, That is the date the parties filed dismissal papers in the Keystone litigation. Four days before this, GTMI had recorded its assignment of M&I Bank's second mortgage and shortly before that, GTMI had already recorded its security interest in the settlement proceeds with the Kansas Secretary of State.

Ron admitted it would have been far simpler for him to directly pay Chase from his Keystone settlement proceeds and acknowledged that the distribution scheme he ultimately chose was considerably more complicated. He testified there was no estate planning purpose for the way he set up this transaction, and also specifically acknowledged that he went through multiple hoops to ensure the funds were never in his hands. Conversely, while Denise was aware of the Keystone litigation and the settlement, and understood Ron intended to use funds to reduce the debt secured by their home, she was not involved in the transactions or discussions structuring the settlement proceeds.

Creditor asserts that one way to discern whether Ron had the intent to hinder, delay, or defraud when he chose this disbursement structure is to compare Ron's testimony, provided under oath at his § 341 meeting of creditors, with his contradictory testimony at trial. Ron originally testified that in March or April of 2012, *he* received $975,000 after payment of attorneys' fees. He testified that he

13

used all but $25,000 of the net settlement proceeds to pay off his first mortgage and to pay down the second mortgage. Ron expressly testified that no portion of the funds was distributed to any third person to deprive Debtors' creditors of access. None of that was true.

At trial, when confronted with the actual settlement documents the Creditor had obtained during discovery (obviously well after the § 341 meeting), Ron had no choice but to admit that in fact *all* of the settlement funds belonging to him were routed to third parties, and that some of the money was actually paid to persons other than mortgagees, e.g., to CBIZ and Debtors' own company, BCGG. Ron also acknowledged that he wanted to use his settlement funds to pay Chase and admitted he *did not want Creditor to have access to the settlement funds before he could pay Chase.*

The Court now turns to Mr. Gortenburg's knowledge of Creditor's judgment, and its efforts to collect, during the time the payout of the Keystone proceeds was being structured. His testimony was enlightening. He first testified that it was possible the subject of Creditor's judgment was discussed during the time he and Ron were structuring this deal, but he could not remember any specifics. In his deposition before trial, however, he had first testified the subject had not come up at all, but later in that same deposition, he specifically asked the questioning lawyer to revisit the topic, and then admitted the subject of Creditor's judgment might well have been discussed "conversationally."

The Court, after hearing (and seeing) all the evidence, believes that all these

14

parties—from Debtors to Mr. Gortenburg, to Mr. Slabotsky—well knew Creditor had recently made collection efforts only three to four months before it became certain Ron would receive a sizeable settlement, and all intended to and did structure this entire deal to ensure Creditor could not get its figurative hands on the Keystone settlement proceeds.

### C. The Founding of Image Truck Partners; Documenting its Creation

In September 2012, Todd went to work for Truck Center of America as a truck broker and signed a non-compete agreement. Todd learned the truck broker business from this job, and loved his work, but not his boss. As a result, Todd decided he would start his own business modeled after Truck Center of America's business. When Todd's boss learned of this plan, he fired Todd (in January 2014) and sued him for violating the non-compete agreement.

To get around this problem, Todd went to his father and they agreed Image Motors would create a limited liability company named Image Truck Partners, and that it would use the same business model Truck Center of America used. Todd testified that he needed Image Motors to own the business, rather than himself, because of the existing Truck Center of America litigation. For this reason, Debtors' other son, Jeff (now a lawyer), drafted the paperwork to create Image Truck Partners as a limited liability company with Image Motors as its sole member, and Ron as its president.

Although neither Ron nor Image Motors had ever worked in the truck

15

industry, Image Motors had at least two things Todd didn't have and needed: 1) a dealer's license, and 2) an operating payroll system. A dealer's license allows a dealer to buy and sell vehicles in Kansas, and Todd could not operate as a truck broker without one. Todd understood the process of obtaining such a license was onerous.

Image Motors also had an existing payroll system with an established federal tax identification number that Todd also needed for the truck business. Image Motors was thus considered the "pay master" for paychecks issued to employees of both Image Motors and Image Truck Partners by their bookkeeper Barbara Rogoff.

By March 2015, Ron was devoting himself full time to the truck business for Image Truck Partners, and in fact he and Todd moved the business to a different location because they no longer needed space to store vehicles sold by Image Motors. Ron testified, in fact, that Image Motors was essentially a dead company as early as March 2014. Nevertheless, Todd was still paying Ron sporadically so Ron could pay his living expenses, even though Ron's truck sales did not justify the income. Todd and Ron started discussing Todd taking over the business officially at this point, and discussed the need to meet with their CPA, Mr. Slabotsky, after tax season concluded.

Multiple parties testified about a meeting between Mr. Slabotsky, Ron, and Todd to discuss how to consummate Todd's desire to officially own Image Truck Partners. Although Mr. Slabotsky billed for his time and assumed he'd have business records documenting the meeting(s), he found none. General estimates

16

ranged from mid-May to early summer of 2015. Ron insisted the meeting occurred prior to the date Creditor renewed collection efforts on May 26, 2015.

At the meeting, the parties discussed that Todd would buy Image Truck Partners from Image Motors by paying his parents $8000 a month for eight months for a total "consideration" of $64,000. Both Ron and Todd testified that they "just arrived" at the $64,000 figure, and neither hired anyone to value the business. Nothing was signed at the meeting, no changes were made to the Image Truck Partners Operating Agreement at or after this meeting, and no transfer was effectuated. It appears the parties elected to pay the $64,000 over eight months because Todd thought Ron could finish learning the truck business within about eight months, and $8000 per month approximated Debtors' monthly living expenses.

Regarding the $64,000 "purchase" price, at some point Ron authorized Image Truck Partner's bookkeeper to make two journal entries (e.g., entries documenting, after the fact, a "correction") at the exact time the parties stated they agreed on a sales price for Image Truck Partners. On the general ledger for Image Truck Partners, there is a journal entry for May 31, 2015. It states "Reclass Bank to Inven" for $324,250. As a result, this amount was deducted from the account that date. The memo/description note states: "Adjust Inventory to Actual per RC – BJR." Todd testified that the "RC" is Ron and the "BJR" is the bookkeeper Ms. Rogoff. After deducting that sum, the balance in the account dipped to $63,969.19.

Then on June 1, 2015, the date Ron has said his sale of Image Truck to Todd

17

was effective, the bookkeeper made another journal entry reversing that entry. It states "Reclass Bank to InveR" for $324,250, and that amount was then added back into the account. Todd testified that this was done because a deposit had been misclassified as cash, and needed to be reclassified as inventory. But Todd was never able to explain why the account was then "corrected" again to reverse the correction. Todd also never explained other large deposits and expenses made around the same date. Once again, Todd and Ron essentially ask this Court to believe that this series of events, all surrounding the purported purchase date, is just another coincidence.

But Creditor's expert, a CPA, confirmed this double "correction" served to outwardly (and artificially) decrease the apparent value of the business by $324,250, at least on paper. And the amount chosen to "correct" served to force the value on the date of the purported sale to be $63,969.19—magically within $30.81 of the agreed $64,000 purchase price for the business.

Also regarding the $64,000 purchase price, because Todd possessed most of the truck industry knowledge, Mr. Slabotsky—who frequently consults on the buying and selling of businesses and how to make those sales "tax efficient"—told Ron and Todd that the company (without Todd's expertise) had no value. However, he suggested Todd could help his parents financially while also folding Ron into the business and building relationships with customers by retaining Ron on the payroll. He also advised it would be "tax efficient" to keep Ron on the payroll because it would earn Todd a business deduction for Ron's salary (as compared to no deduction

18

if Todd merely gave his parents the money).

For trial, however, both parties hired expert witnesses to value the business as of May 29, 2015 (the date the Purchase Agreement states it was executed) and as of February 3, 2016 (the day the Purchase Agreement was actually executed). Creditor's motive for doing so was to establish that Ron sold an asset (his 99% interest in Image Motors) to an insider for inadequate consideration either a few months before, or a month after bankruptcy—depending on when the sale was actually consummated—and took efforts to hide that transaction within the bankruptcy schedules.

Both experts elected to determine the fair market value of Image Truck Partners as a going concern using the Income Approach and the Market Approach. A summary of the experts' valuations is provided here, with a more detailed explanation provided below. Creditor's expert determined the value on May 29, 2015 to be $367,000 and on February 3, 2016 to be $395,000. Debtors' expert determined the value on May 29, 2015 to be $130,000 and on February 3, 2016 to be $53,200. What is critical about both experts' testimony is that both found Image Truck Partners was a valuable asset of Image Motors—which the Court finds was essentially the same as saying it was a valuable asset of Ron's—when he filed bankruptcy on January 25, 2016.

Returning to Todd's decision to buy Image Truck Partners, Todd testified that after this (possible) May 2015 meeting, he contacted the family attorney, Stewart Stein, and requested that Mr. Stein draft the documents to transfer

ownership. Todd didn't follow up when those documents were not received, but he believes that he became the owner of Image Truck Partners as of June 1, 2015, and that no one else had any interest in the company after that date.

The Purchase Agreement the parties ultimately signed was dated May 29, 2015—again, one day after Creditor sought a debtor's exam and the exact date an order requiring one was entered. The Purchase Agreement expressly states "the parties have signed this agreement the day and year just above written."[9] But that statement was not true. Through the use of metadata, Creditor learned during discovery that this Purchase Agreement was not even drafted for another nine months (on February 1, 2016), just six days after the bankruptcy filing.

When confronted with the discrepancy regarding the actual date the Purchase Agreement was signed, Todd admitted that although he did not receive the document from Mr. Stein until February 1, 2016, he elected to backdate the document to the date when he thought they had met and agreed to the deal. Todd testified that it was completely coincidental that the Purchase Agreement was backdated to the same date the order in aid of execution was entered in Creditor's state court case against his parents. The choice of this date is hard to reconcile, however, as Todd in another discussion at trial testified that the (later in time) July

---

[9]  Exh. 64 ("This agreement is made this 29 day of May, 2015 . . ."). Contrast that with Exh. 67, the Amended Operating Agreement of Image Truck that Jeff drafted, which uses the phrases "Dated as of June 1, 2015," "made and entered effective as of June 1, 2015," and "to be effective on the date first above written." The date the Amended Operating Agreement was actually signed is not contained on the document, but it could not have been until February 3, 2016 or after, since metadata shows that is when Jeff first drafted it.

31, 2015 date marking the end of the settled non-compete with Truck Center of America could *not* have been used as the purchase date, because Todd did not feel enough time had lapsed since the settlement of the Truck Center of America litigation to justify using that date.

Regardless of date made, the terms of the Purchase Agreement stated that Debtors were both engaged to work for Image Truck Partners; Ron as consultant and Denise as part-time office clerk. The Purchase Agreement also stated that Debtors would be paid $8000 per month as wages beginning on June 1, 2015, and ending on January 31, 2016, and that these wages would constitute full payment of the agreed purchase price of $64,000. Of the $8000 each month, $7000 was paid to Ron and $1000 paid to Denise.

Ron "personally, and as President of Image Motors"[10] signed the backdated Purchase Agreement causing the transfer of assets of Image Truck Partners from Image Motors to Todd. Mr. Krigel, the owner of 1% of Image Motors, had no involvement in the transfer of Image Truck Partners and received nothing from this sale. Ron admitted that only he benefitted from the Image Truck Partners sale (and Denise for $1,000 x 8). Image Motors received no consideration; all money was simply recycled through Image Motors to pay Ron and Denise their living expenses for eight months—and to get Todd a tax deduction for doing so. Despite this testimony and the Purchase Agreement classifying the $8000 per month as wages,

---

[10]  Exh. 64.

Ron nevertheless insists that this $64,000 was really payment from Todd to purchase Image Truck Partners.

Todd's testimony was similarly conflicting. He testified that the $64,000 was earnings from Image Truck Partners paid to Ron and Denise, and resulted in a net zero to Image Motors as none of the money stayed with Image Motors. Todd also testified, however, that the $8000 per month was not earned, instead he simply gifted this to his parents because $8000 is what they needed to pay their monthly expenses. No one could explain why Denise was paid $1,000 a month as consideration for the sale of Image Truck, as all agree she never had any ownership in Image Motors. And even after these eight months ended, Todd directed Image Truck Partner's bookkeeper to continue to pay Ron simply because he needed the money—not because he was entitled to payment from truck sales.

As noted above, no one now disputes that the documentation to memorialize Image Motors' sale of Image Truck Partners, its wholly owned LLC, was not executed until after Debtors filed bankruptcy. The evidence is clear the Purchase Agreement was not drafted until February 1, 2016, and the pertinent Amended Operating Agreement was not drafted until February 3, 2016. The need for this paperwork was precipitated by discussions during this time period that Todd had with the bank Image Truck Partners used, Mission Bank, which requested accurate documentation of ownership for its files after Debtors filed bankruptcy.

### D. Additional Creditor Efforts to Collect

Creditor had made no efforts to contact or collect from Debtors for the two-

22

year period beginning March 2013, when it renewed its judgment, until May 26, 2015, when it filed garnishment orders in state court. And two days after that, on May 28, 2015, it requested an order for Debtors to again appear in aid of execution. The order requiring Debtors to appear was entered the next day, on May 29, 2015. Of course, this is the very date to which Ron and Todd later backdated the Purchase Agreement between Image Motors and Todd for Todd's purchase of Image Truck Partners.

On June 25, 2015, Debtors' counsel in the state court case (their present bankruptcy counsel) assured Creditor that Debtors had nothing to hide and promised Creditor an unencumbered look at Debtors' financial affairs. Creditor and Debtors ultimately agreed that instead of appearing for a debtor's exam, Debtors would produce all requested documents, including those related to "cash or other assets transferred to or from you"[11] or "any business owned or operated by you,"[12] from September 1, 2011 (the date of their last debtors' examination) to the present.

Although the Keystone litigation had been pending and settled during this time, and Ron, via Image Motors, had created Image Truck Partners during this time and operated it since March 2014, Debtors produced no documents related to the Keystone settlement or Image Truck Partners. And this decision by Debtors not to produce any documents about Image Truck Partners occurred within a month or

---

[11] Exh. 6 at ¶ 1.

[12] *Id.* at ¶¶ 24–25.

so of when Ron now claims he and Todd met with Mr. Slabotsky to discuss the formal turnover of Image Truck Partners to Todd. The Court thus cannot find this was an innocent omission. Ron also later attempted to excuse his failure to disclose documents about the Keystone settlement based on a confidentiality clause Keystone had required.[13]

Further supporting this Court's decision that Ron's actions were done with the intent to hinder, delay, or defraud Creditor, Ron admitted that from this point on, he began to cash all checks he received so they would not be subject to garnishment. He apparently understood Creditor was not going away.

### E.    Debtors' January 2016 Bankruptcy

On January 25, 2016, which was shortly after Creditor filed a motion in state court to compel Debtors to provide additional information in aid of execution, apparently believing Debtors had not, in fact, fully cooperated as promised, Debtors filed the Chapter 7 petition underlying this adversary proceeding, along with all Schedules and the Statement of Financial Affairs ("SOFA"). All were prepared with the assistance of counsel and signed under penalty of perjury. Denise testified that she "probably" reviewed the filing and went line by line through it with their

---

[13]  The confidentiality clause stated, in part: "The Parties agree to keep confidential the existence, terms, and contents of this Agreement from any person other than their attorneys, accountants, . . ., lenders, . . . affiliates, . . . or if compelled by a court of competent jurisdiction . . ." Exh. 29 at ¶ 3(a). The agreement also stated: "In response to any inquiry regarding the resolution of the Lawsuit, the existence of this Agreement, and/or the terms and contents of this Agreement by any person or entity not authorized to receive confidential information under this Agreement, the Parties agree to limit their response to a statement that 'the matter is confidential.'" *Id.* at ¶ 3(c).

attorneys; Ron affirmatively testified that he reviewed all documents prior to filing.

In Debtors' Schedules, they list nearly all of their real and personal property as exempt using Kansas exemptions, including their residence, stating the value of the exemption for each as "100% of fair market value, up to any applicable statutory limit."[14] Adding all the assets they attempted to exempt, the total exceeds $2.1 million.

Debtors' Schedules state that they were both employed by Image Motors at filing, not Image Truck Partners. Denise testified that all she knew was that she was working for her husband, and did not know the business entity paying her as all checks were direct deposited. At other points, however, she stated that she is not currently working for Image Motors or Image Truck Partners, and does not know the last time she received a paycheck.

Ron's testimony was even more conflicting: he testified that he listed Image Motors as his employer because Image Motors was the pay master for his checks and that is who his W2 comes from. But this contrasts with his testimony that he effectively wound down Image Motors by March of 2015 (and that Image Motors was essentially a dead company by March 2014) and that his current employer is and was on the date of petition Image Truck Partners. In fact, he could not remember the last time he was paid by Image Motors for Image Motors work.

His varying testimony was highlighted by his admission that he considers

---

[14] Exh. 10 p.25.

25

Image Truck Partners as Todd's employer even though the checks the bookkeeper writes to Todd are on the same Image Motors pay master account. Ultimately, after repeated questioning, Ron admitted that Image Motors was merely the name on the pay check account, not his true employer on the date of petition. Thus, the Court finds it was an intentionally false statement for Debtors to state on Schedule I that they were employed, on the date of petition, by Image Motors.

Debtors also disclosed in their Schedules that Ron was the 90% owner of Image Motors at the time of filing and that it had "no assets or debts."[15] A couple of months later, at his § 341 meeting of creditors, Ron corrected this, noting he owned 99% (not 90%) of Image Motors, and that Mr. Krigel owned the remaining 1%. Over four months after their § 341 testimony, on July 5, 2016, Debtors amended their bankruptcy Schedules to make this, and only this, correction.

Ron also revealed for the first time at the § 341 meeting that Image Motors had owned 100% of Image Truck Partners, which he at that point readily identified as his current employer, but that Image Motors sold Image Truck Partners to Todd on June 1, 2015 (only eight months prior to the bankruptcy). This information could not have been discerned from the Schedules.

Debtors have a Southwest Airlines credit card and someone made a $12,830.03 payment on that unsecured account about a month before bankruptcy—on December 16, 2015. This payment and the source of the payment

---

[15] *Id.* p.20.

were omitted from disclosures of payments made by or on Debtors' behalf on their SOFA, although that form requires debtors to disclose any payments exceeding $6,225 within 90 days of bankruptcy.

## F.    Additional Post-Filing Activities and Miscellaneous Facts

Even after the purported sale of Image Truck Partners by Image Motors, Ron and Todd continued to hold themselves out to customers and the public as co-owners of Image Truck Partners and Image Motors. Todd repeatedly sent letters to customers assuring them that both Image Truck Partners and Image Motors were "owned by Todd and Ron Coppaken and either party ha[d] the authority to sign for either entity."[16] Todd admitted that the reality was that Ron did not own Image Truck Partners, and that he had sent these letters to address concerns of truck buyers and sellers who raised the issue that Image Truck Partners was not using a dealer's license in its own name for the transactions. Todd and Ron made other public representations blurring the lines of ownership after the purported sale, representing that both companies were "owned by Todd and Ron Coppaken."[17]

The parties have stipulated that Debtors were insolvent at the time they used the Keystone settlement funds to obtain equity in their residence in 2012, and that they were insolvent on May 29, 2015, when Ron claims he sold Image Truck Partners to his son, and at all relevant times thereafter. The parties also stipulated

---

[16]  Exh. 88.

[17]  *See, e.g.*, Exh. 93.

27

that Debtors have insufficient assets to meet their liabilities.

## II.    Conclusions of Law

The parties stipulate to the Court's jurisdiction, and consent to the trial and entry of a final order by this Court.[18]

Creditor, as the party objecting to the homestead exemption under § 522(o), bears the burden of proof as to its objection[19] by a preponderance of the evidence.[20] And as the party objecting to Debtors' discharge, Creditor also bears the burden of proof to show the elements of § 727 by a preponderance of the evidence.[21] The Court is cognizant also that "the Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor."[22]

### A.    Objection to Homestead Exemption under § 522(o)(4)

The Bankruptcy Code permits the exemption of certain property from the estate, and Kansas has opted out of the federal exemption scheme in favor of state-created exemptions.[23] In Kansas, both a state statute and the Kansas Constitution provide for a liberal homestead exemption.[24] But with the BAPCPA changes in

---

[18]   Adv. No. 16-6048, Doc. 94 p.2.

[19]   *Soule v. Willcut (In re Willcut)*, 472 B.R. 88, 92 (10th Cir. BAP 2012).

[20]   *Wolters v. Lakey*, 456 B.R. 687, 701 (D. Kan. 2011).

[21]   *First Nat'l Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156, 1156–57 (10th Cir. 1991).

[22]   *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997).

[23]   § 522(b)(1)–(b)(2).

[24]   K.S.A. § 60-2301; Kan. Const. art. 15, § 9.

2005, Congress elected to place limits on that homestead exemption.[25]

Those limits include § 522(o)(4), "which prevents a debtor from claiming a homestead exemption to the extent [the debtor] acquired the homestead with non-exempt property in the previous 10 years 'with the intent to hinder, delay, or defraud a creditor.'"[26] Section 522(o) reduces the value of a debtor's homestead exemption when it applies, and "works a significant, if not historical change on the manner in which the pre-filing conversion of non-exempt assets to exemptions in Kansas must be treated in bankruptcy."[27]

The specific language of § 522(o) calls for the "value of an interest" in real property that a debtor claims as a homestead to be reduced under certain conditions. The exemption:

> [S]hall be reduced to the extent that such value is attributable to any portion of any property that the debtor disposed of in the 10-year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, . . . if on such date the debtor had held the property so disposed of.

---

[25]  *In re Willcut*, 472 B.R. at 93.

[26]  *Law v. Siegel*, 134 S. Ct. 1188, 1196 (2014); *In re Agnew*, 355 B.R. 276, 280 (Bankr. D. Kan. 2006) ("Section 522(o)(4) is a limitation on exempt homestead interests to the extent of any value of the homestead attributable to fraudulent conversion of non-exempt assets within ten years before filing.").

[27]  *In re Anderson*, 386 B.R. 315, 328 (Bankr. D. Kan. 2008). Because of this 2005 Code change, many of the cases Debtors cite in their Trial Brief are completely (and disappointingly) inapposite, at best. Debtors rely on cases that laud Kansas' sacrosanct homestead exemption and require a showing of a "peculiar equity" in the converted assets to deny a homestead exemption, *see, e.g.*, *In re Barash*, 69 B.R. 231, 232–33 (Bankr. D. Kan. 1984). But these dated cases entirely fail to address § 522(o)'s change to that structure. Put simply, Debtors' position on this point is not, and has not been, the law since 2005.

29

Section 522(o) "was enacted to prevent the fraudulent attempt to build up equity in a homestead."[28]

To prevail on a claim under § 522(o), the movant must establish four elements:

> (1) that the debtor disposed of property within the 10 years preceding the filing of the bankruptcy petition, (2) that the proceeds from such disposition were used to increase the value of the debtor's homestead, (3) that the property disposed of was not itself exempt, and (4) that in doing so, the debtor acted with the intent to hinder, delay or defraud a creditor.[29]

The first three elements are not difficult to establish, but the fourth element typically is. That is because direct evidence of fraudulent intent is "rarely exhibited," and courts must instead look at circumstantial evidence, including "badges of fraud" to discern intent.[30] "Courts agree that the 'intent to hinder, delay or defraud a creditor' language found in § 522(o) should be construed the same as in 11 U.S.C. §§ 548(a)(1) and 727(a)(2)(A), where the same language is found."[31]

Regarding the first and third elements—that the debtor disposed of non-exempt property within the ten years preceding the filing of the bankruptcy

---

[28] *In re Willcut*, 472 B.R. at 94.

[29] *Wolters v. Lakey*, 456 B.R. 687, 700–01 (D. Kan. 2011).

[30] 4 *Collier on Bankruptcy* ¶ 522.08[5][a] at 522-56 (Alan N. Resnick & Henry J. Commer eds., 16th ed.).

[31] *In re Lakey*, Case No. 09-22538, 2010 WL 8985033, at *6 (Bankr. D. Kan. Oct. 4, 2010) (citing *In re Keck*, 363 B.R. 193, 208 (Bankr. D. Kan. 2007) and *In re Agnew*, 355 B.R. 276, 284 (Bankr. D. Kan. 2006)); *In re Anderson*, 386 B.R. at 329; *In re Keck*, 363 B.R. at 208 ("[A]n actual intent to defraud, similar to what is required under § 727(a)(2)(A) must be shown before § 522(o) will apply.").

petition, Creditor easily established these elements by showing that Ron disposed of his non-exempt Keystone litigation settlement proceeds within the ten years preceding the bankruptcy filing. Ron assigned his right to receive those proceeds to GTMI on March 13, 2012, and the funds were then distributed on March 27, 2012. Debtors filed their bankruptcy petition on January 25, 2016, easily within the ten-year look back period contained in § 522(o). There is no evidence, however, that Denise was ever entitled to any share of the Keystone settlement, or that Denise transferred any property to increase the value in Debtors' homestead during that ten-year time frame.

Regarding the second element, that the proceeds from such disposition were used to increase the value of the home to the debtor, Creditor easily established that Ron used the vast majority of the Keystone settlement funds—$927,620 out of the $982,620—to retire the first and at least partly retire the second mortgage held by M&I Bank on his home.[32] The Tenth Circuit has made it clear that increasing a debtor's equity in his real property satisfies this second element.[33] Thus, Creditor demonstrated that Ron's actions increased the value of Debtors' economic interest

---

[32] Mr. Gortenburg's company, GTMI, never released the M&I Bank mortgage assigned to it, and for which it paid $254,000—even though the Keystone proceeds it received soon after its investment were clearly sufficient to pay both its outlay and Chase's first mortgage note. Thus GTMI claims it still retains a $450,000 (plus interest) second mortgage on Debtors' home, which was later subordinated to a 2013 mortgage given to Sunflower Bank for a $300,000 loan.

[33] *In re Willcut*, 472 B.R. at 95 (holding that "the phrase 'value of an interest in . . . real [] property' refers to increased economic equity in real property due to a fraudulent transfer of non-exempt funds into the property.").

31

in their homestead by $927,620.24.

As to the fourth and final element, Creditor must prove that Debtors used the Keystone settlement proceeds to increase the value of their homestead with an intent to hinder, delay, or defraud it. Creditor claims this is the unusual case where Ron actually revealed direct evidence of his intent to "hinder, delay, or defraud" at trial. Creditor points to Ron's admission that he wanted the Keystone settlement funds to be used to pay off his first mortgage to Chase and that he did not want Creditor to take the settlement funds before he could get them to Chase.

Without doubt, this statement supports the proposition that Ron was actively maneuvering to keep money out of his personal bank accounts and away from Creditor before he could get them to his "preferred" creditors. But a debtor's conversion of non-exempt property to exempt property prior to filing bankruptcy "for the express purpose of placing that property beyond the reach of creditors" is not enough to deprive a debtor of an exemption; there must be "some facts or circumstances which are *extrinsic* to the mere facts of conversion of non-exempt assets into exempt [assets] and which are indicative of such fraudulent purpose."[34]

The Tenth Circuit uses badges of fraud to determine whether this fraudulent intent is present, including:

---

[34] *Addison v. Seaver (In re Addison)*, 540 F.3d 805, 814 (8th Cir. 2008) (emphasis added) (internal quotation omitted). *See also Parks v. Anderson*, 406 B.R. 79, 97 (D. Kan. 2009) ("While the mortgage paydown may have hindered Anderson's creditors and may have been done intentionally, without something more, the bankruptcy court was unable to conclude that Anderson made the transfer with the actual intent to hinder."); *In re Anderson*, 386 B.R. at 331 (stating that intentional actions, without "something more" are insufficient to support a finding of a intent to hinder, delay, or defraud).

32

> (1) concealment of prebankruptcy conversions; (2) conversion of assets immediately before the filing of the bankruptcy petition; (3) gratuitous transfers of property; (4) continued use by the debtor of transferred property; (5) transfers to family members; (6) obtaining credit to purchase exempt property; (7) conversion of property after entry of a large judgment against the debtor; (8) a pattern of sharp dealing by the debtor prior to bankruptcy; (9) insolvency of the debtor resulting from the conversion of the assets; and (10) the monetary value of the assets converted.[35]

And the Tenth Circuit has concluded that "[t]he more badges that are present, the more likely it is that the transfer has been made with intent to hinder, delay or defraud creditors."[36] For that reason, the Court has also collected in one place (Exhibit B) a listing of the evidence meeting these various "badges of fraud" and the myriad false statements and omissions referenced in this decision, lest the sheer number of those badges of fraud, and false and misleading statements, acts and omissions, become diluted within this very long decision. In addition to these badges of fraud, fraud can also "be inferred from a deterioration of the debtor's financial condition after a questioned transaction, or by the existence of a pattern or series of transactions that apparently relate to pressure from creditors."[37]

Creditor demonstrated the existence of numerous "badges of fraud," including the first—concealment. Literally everything Ron did to structure his receipt of the $1.5 million settlement from Keystone is the epitome of concealment. He ensured

---

[35] *U.S. Trustee v. Garland (In re Garland)*, 417 B.R. 805, 815 (10th Cir. BAP 2009).

[36] *Freelife Int'l, LLC v. Butler (In re Butler)*, No. UT-06-077, 2007 WL 8666660, at *5 (10th Cir. BAP Mar. 19, 2007).

[37] *In re Garland*, 417 B.R. at 815.

33

that none of the money ever touched his hands by instead routing it through a corporation owned by a man he considered his best friend. He assigned up to $1.2 million of his anticipated settlement to GTMI, his friend's company, when the only emergent "need" at that point was to stop M&I Bank's foreclosure of the second mortgage, which had already been accomplished with GTMI's payment of only $254,000. In other words, before the settlement was even consummated, Ron was already plotting to make sure Creditor could not locate the funds so he could funnel it to his home lenders (and in smaller amounts, to other creditors and entities he preferred to pay).

Ron relied on a second lifelong friend, Mr. Slabotsky, to negotiate the purchase of the second mortgage for a highly discounted sum about a month before the settlement was consummated, and at a time when the Court believes Mr. Slabotsky knew a large settlement was probable. The Court believes Mr. Gortenburg knew this too, and thus had no risk of loss when he purchased the second mortgage. In fact, Mr. Gortenburg was (or could have been) immediately reimbursed for his outlay but nevertheless kept the remainder of the settlement proceeds in an account safely away from Debtors' creditors until Debtors requested GTMI cut the check to pay off Chase's first mortgage about three months later.

Ron put this entire scheme into motion two months before the Keystone settlement was finalized, because Creditor had very recently resurfaced trying to collect its judgment. Ron thus knew he had to hide the settlement at least long enough to route the funds to pay down the debt on his home, and thus create equity

34

in it. He made sure the settlement funds never touched his hands or were deposited in any account where Creditor could find it, and instead implemented this complicated payout structure to ensure that Creditor could receive none of his Keystone settlement funds—funds that were so substantial that they could have paid Creditor's judgment two times over.

The Court finds it strains credulity to believe all of this was a mere coincidence or innocently done. First, Mr. Gortenburg waited until all the money was safely tucked away before recording the mortgage assignment he had received a month earlier from M&I Bank. Secondly, the dismissal papers weren't filed in the Keystone court record until early April 2012, again, after Mr. Gortenburg had taken possession of the funds for safekeeping. Had Creditor been tracking this lawsuit, hoping for Ron to receive a verdict or settlement to help pay its judgment, it would have been thwarted by efforts to research public land or court records. And regardless of whether this scheme started out as a friendly offer from lifelong friends (Mr. Gortenburg and Mr. Slabotsky) to help Debtors save their home from the pending foreclosure action, or what the intent of those two men was, the facts show that Ron—the one whose intent matters—jumped through multiple hoops to actively conceal his prebankruptcy conversion.

Turning to the second badge of fraud, that a debtor continued to use the transferred property, Debtors then used the new equity in their home to take out additional loans and lines of credit to finance their real estate taxes and income taxes as well as other expenses. Debtors essentially laundered the Keystone

35

settlement money through GTMI and then took out a $250,000 line of credit from Yukel Holdings (another Mr. Gortenburg entity) and a $300,000 mortgage from Sunflower Bank to pay real estate taxes and taxes on BCGG, another business Debtors owned. Obviously, if Ron had retained the cash from the settlement until the time these taxes actually came due, those funds might have been attached by Creditor in the interim.

Third, although Ron did not transfer the Keystone settlement proceeds directly to a family member, he used those settlement proceeds to benefit a family member—his wife, Denise, and he also involved his lifelong friends in the process. None of this was an arms-length transaction amongst disinterested parties. Ron admitted his mortgages were in default. But rather than directly pay those mortgages after depositing his settlement into a bank account, for example, or simply ask Mr. Gortenburg to buy out the M&I Bank mortgage to stop the foreclosure of the second mortgage, Ron set up the scheme to transfer the funds to GTMI and have GTMI make both payments.

Fourth, the entire series of events appears to have been precipitated by the debtor's examination that Creditor undertook of Ron in the fall of 2011—when the Keystone litigation was pending. Within a few months of that debtor's exam, Ron was actively working with Messrs. Slabotsky and Gortenburg to set in motion the transactions detailed above. Creditor had a large judgment against Debtors; Creditor made it clear to Debtors it intended to collect on that judgment, and soon thereafter, Ron began actions that resulted in hiding his Keystone settlement from

36

Creditor. Yes, he disclosed the existence of the litigation in his debtor's examination—a fact he could not have hidden without committing perjury. But that only strengthens the Court's belief that this made Ron realize that this Creditor was not going away, and would likely discover (and attempt to collect) the cash available from any settlement. And yes, the conversion occurred a number of years before Debtors actually filed bankruptcy, but what is more important is that the conversion occurred within months after Creditor's collection activity.

Fifth, Ron also testified that he had not structured the Keystone settlement for estate planning purposes. Instead, he admitted that the way he structured it was "more complicated" than it needed to be and that he jumped through many hoops to ensure he did not directly receive the funds.

Sixth—regarding the monetary value of the assets—even though the transaction was not "big money" to Mr. Gortenburg, the transaction was big money to Debtors. Debtors stipulate that they were insolvent at the time Ron transferred his Keystone money to GTMI and at all times thereafter. The amount of money involved ($927,620.24) was large by any definition, but even more so considering that Debtors' sole income at this point was from Image Motors, which both Debtors testified was minimal.

In addition, the Court simply cannot credit the testimony from Mr. Gortenburg that he was the one who wanted the transaction set up this way to protect *his* financial interests. First, Mr. Gortenburg's interest ($254,000 purchase of M&I Bank's mortgage) was fully protected by the equity in the home. Again, the

house was worth $1.2 million, the first mortgagee was owed less than $673,000, and his own investment was $254,000, leaving an equity cushion exceeding $275,000. He had little, if any risk, since he also admitted he trusted Ron 100% to directly pay Chase from the settlement proceeds (had he instead elected to pay off the first mortgage directly).

In addition, Mr. Gortenburg treated this loan differently than all other loans he had made to Ron, Todd, and their businesses. Mr. Gortenburg regularly provided short terms loans to Image Truck Partners ranging in amounts from $20,000 all the way up to a $672,000 loan. Mr. Gortenburg also pledged collateral to enable Image Truck Partners to receive a $250,000 line of credit from Mission Bank in May of 2014. Yet none of that lending was memorialized or formalized; he did not get his lawyers involved even with larger transactions, and it was all done on a handshake transaction after a simple telephone call because of the close family relationship. The Court simply does not believe that Ron structured the transaction the way he did because that is how Mr. Gortenburg wanted it.

The Court also does not believe Mr. Gortenburg's excuse that the reason for the failure to "paper up" all these other loans to the Coppakens or their businesses —even the $672,000 one that is obviously more than double the $254,000 M&I Bank investment, was that those were short-term loans. Surely a lending relationship lasting from only January 25, 2012, when he purchased M&I Bank's second mortgage, to the end of March when the Keystone settlement money was disbursed, similarly qualifies as a short term loan. Even if Mr. Gortenburg was unsure when

38

the Keystone settlement would be finalized, he similarly did not know when Image Truck Partners would be able to repay him for the much larger loan. And his risk was obviously much bigger for the latter transaction.

The fact Ron chose not to tell the truth about how the settlement funds were received and how they were spent when he testified at his § 341 meeting also buttresses the Court's conclusion that Ron intended to hinder, delay, and defraud Creditor when he structured the Keystone payout. Ron told a series of lies in that § 341 meeting. Here are some of them:

> 1) Ron first testified that $975,000 was wired to one of his own accounts, but then he changed that testimony to say all the money first went to his attorneys. Less critical in the scheme of things, but also false, was the amount; he actually was to receive $982,620;

> 2) Ron testified that all but $25,000 of the settlement funds were used to pay off Debtors' first mortgage and pay down Debtors' second mortgage. This was also untrue. In fact, he prepaid some future accounting fees and some future expenses connected with BCGG, and he paid some attorney fees to Evans and Mullinix (the attorneys who later filed this bankruptcy) that were said to be unrelated to the Keystone litigation;

> 3) Ron testified no funds went to any third person for safekeeping when the uncontroverted evidence at trial showed the vast majority ($927,620) went to a third party for safekeeping.

When these facts are coupled with Ron's explicit admission that he devised this payment scheme so he could pay the funds to Chase and specifically avoid paying Creditor, and with Mr. Gortenburg's admission that it was very possible he discussed the subject of Holley's judgment with Ron when they were formulating this deal, it is not difficult for the Court to find that the facts, taken as whole, demonstrate Ron's intent to hinder, delay, or defraud Creditor. Thus, Creditor has

39

satisfied the fourth element to establish a § 522(o)(4) claim. This was more than placing property beyond the reach of Creditor. This was a scheme to hide and conceal, in direct response to Creditor's recently renewed efforts to collect.

Debtors' only argument to the contrary is unpersuasive. Debtors claim they were simply trying to satisfy their mortgages and save their home from foreclosure, not to obtain equity, and that they had no fraudulent intent. Ron tried to demonstrate that he had been open and transparent with Creditor during the times it sought information to collect the judgment. But the facts in evidence and the badges of fraud paint a drastically different picture. One example is Ron's failure to provide Creditor any documents about the Keystone settlement when the document request clearly requested such information.

Ron relies on the terms of the confidentiality agreement in the Keystone settlement for his failure to disclose the settlement to Creditor, but that agreement specifically instructs what to do if the subject of the settlement is raised:

> In response to any inquiry regarding the resolution of the Lawsuit, the existence of this Agreement, and/or the terms and contents of this Agreement by any person or entity not authorized to receive confidential information under this Agreement, the Parties agree to limit their response to a statement that 'the matter is confidential.'

Ron provided no such statement. Had Ron made that disclosure, Creditor could have inquired further, and/or obtained the court order that would have allowed disclosure. The Court thus finds the confidentiality agreement did not excuse Ron's decision to remain silent.

As a result of these actions and omissions, the Court finds Ron had no

40

legitimate basis for acting as he did other than to hide money. Again, how Ron elected to handle the settlement proceeds was "something more" than just exemption planning; all of these actions instead represented extreme measures to conceal assets and essentially launder money.

The Court finds that Creditor has carried its burden of proof on its § 522(o)(4) claim as to Ron, but not as to Denise. There was no evidence that Denise (regardless of any of the other elements) disposed of property to increase the value of her homestead within the applicable time period.

Section 522(o) provides "the ability to recoup the property that was fraudulently transferred for the benefit of the estate, similar to the powers the trustee has to avoid preferential or fraudulent transfers under §§ 547 or 548."[38] Ron's homestead exemption is therefore reduced by $927,620.24, the amount that represents the equity in Debtors' homestead that was increased by Ron's fraudulent conduct.[39]

### B.    Denial of Discharge

Section 727 generally grants Chapter 7 debtors a discharge, "[h]owever, the

---

[38]  *In re Keck*, 363 B.R. at 208.

[39]  *See id.* at 209, 212 (sustaining the trustee's objection to the debtor's homestead exemption under § 522(o) as the trustee met his burden to establish "the extent to which the value of Debtor's homestead was increased by" the fraudulent conduct and stating "because Debtor transformed non-exempt assets into exempt assets with the requisite intent, his homestead exemption is reduced by $15,972.79, the Trustee's objection is sustained in that amount, and the estate is granted an equitable lien against his home in that amount").

41

expectation is that, to be entitled to discharge, the debtor must deal fairly with creditors and with the court. This obligation is imposed indirectly through a series of objections to discharge set out in Code § 727(a)."[40] The pertinent prohibited activities are:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–
>> (A) property of the debtor, within one year before the date of the filing of the petition; or
>> (B) property of the estate, after the date of the filing of the petition;
> . . .
> (4) the debtor knowingly and fraudulently, in or in connection with the case--
>> (A) made a false oath or account;
> . . .
> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

Creditor has alleged a cause of action under §§ 727(a)(2), 727(a)(4)(A), and 727(a)(5). Although "[t]he various discharge exceptions of § 727(a) are independent, and a plaintiff need only prove the elements of one exception by a preponderance of the evidence in order to obtain a denial of discharge,"[41] the Court will analyze all three claims.

### 1. Section 727(a)(2)

---

[40] *Wieland v. Gordon (In re Gordon)*, 526 B.R. 376, 387–88 (10th Cir. BAP 2015) (internal quotation and alteration omitted).

[41] *Id.* at 394.

The Tenth Circuit has stated that "a party objecting to a discharge under [§ 727(a)(2)(A)] must show by a preponderance of the evidence that (1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the estate, (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor."[42] Similarly, "[t]o deny a debtor's discharge under § 727(a)(2)(B), the movant must establish by a preponderance of the evidence that the debtor transferred or concealed property of the estate after filing bankruptcy with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of the property."[43]

Creditor's claim under § 727(a)(2) is solely against Ron, but it is not an easy one to prove. First, in order to determine whether subsection (A) or (B) of § 727(a)(2) applies here, the Court must decide whether Image Truck Partners was transferred to Todd in May 2015 or February 2016. Second, the Court must decide (since Image Truck Partners was supposedly owned and transferred by Image Motors) whether Image Motors was merely a shell that should be pierced, leading to a finding that it was actually Ron who transferred Image Truck Partners. And finally, the Court must decide the ultimate question: did Ron/Image Motors transfer Image Truck Partners with the intent to hinder, delay, or defraud Creditor?

First things, first: when was Image Truck Partners transferred? Despite the

---

[42] *Mathai v. Warren (In re Warren)*, 512 F.3d 1241, 1249 (10th Cir. 2008) (internal quotations omitted).

[43] *Hepner v. Kleinhans (In re Kleinhans)*, No. CO-09-028, 2010 WL 1050583, at *3 (10th Cir. BAP Mar. 23, 2010).

43

copious testimony about what Todd and Ron intended to happen and when, the Court actually finds this to be the easiest question, as the parties' intent here is irrelevant. The Operating Agreement for Image Truck Partners states that it should be governed by Kansas law,[44] and the Kansas Supreme Court has repeatedly stated that general contract principles apply to the interpretation of the operating agreement of a limited liability company.[45] The Supreme Court has held that

> When possible, a court ascertains the parties' intent from the four corners of the operating agreement, construing all provisions together and in harmony with each other rather than by critical analysis of a single or isolated provision. When the language of the contract is clear, there is no room for construction or modification of the terms. A contract is not ambiguous unless two or more meanings can be construed from the contract provisions.[46]

The Operating Agreement clearly defines the terms by which additional members are added. A new member can be admitted to Image Truck Motors "only upon the satisfactory completion" of two actions. First, the current member must consent to the new member's admission and to the "amount and character of the proposed capital contribution."[47] This could have occurred at the supposed mid-2015

---

[44] Exh. 55 p.1 at article 1.2.

[45] *See, e.g.*, *Iron Mound, LLC v. Nueterra Healthcare Mgmt., LLC*, 298 Kan. 412, 417 (2013) (citing additional cases).

[46] *Id.* at 418 (internal quotations and citations omitted).

[47] Exh. 55 p.6 at ¶ 8.1. The Paragraph states in full: "A person shall be deemed admitted as a Member of the Company only upon the satisfactory completion of the following: (a) the Member has consented to the admission of the Person as a Member of the Company and to the amount and character of the proposed capital contribution of such new Member; and (b) the Person has accepted and agreed to be bound by the terms and provisions of this Operating Agreement and has executed and delivered a counterpart

44

meeting between Ron, Todd, and Mr. Slabotsky. But the second required action is that the proposed new member "has accepted and agreed to be bound by the terms and provisions of this Operating Agreement and *has executed and delivered* a counterpart thereof with such amendments as deemed necessary or desirable by the Member."[48] There is no doubt that the earliest this second action occurred was February 3, 2016—nine days after Debtors filed bankruptcy. The record evidence demonstrates this, and the parties' testimony explicitly confirms it.

As a result, the Court finds that subsection (B) of § 727(a)(2)—which deals with postpetition transfers—applies, and Creditor must next show that Ron "transferred or concealed property of the estate" in February 2016 "with the intent to hinder, delay, or defraud a creditor."[49] This brings us to the second step of our inquiry. Did Ron transfer Image Truck Partners, or did Image Motors transfer Image Truck Partners? Stated another way, since Image Truck Partners was not transferred until nine days postpetition, was Image Truck Partners property of Debtors' bankruptcy estate on the date of filing? Creditor's theory is that Ron had the right and ability to control Image Truck Partners, and that, therefore, Image Truck Partners was essentially Ron's property at the time it was transferred.

Generally, "property of the estate" includes "all legal or equitable interest of

---

thereof with such amendments as deemed necessary or desirable by the Member, and has executed and delivered such other documents or instruments as the Member may require."

[48] *Id.* (emphasis added).

[49] *In re Kleinhans*, 2010 WL 1050583, at *3.

45

the debtor in property . . . wherever located and by whomever held."[50] Property interests are determined by state law, but then federal bankruptcy law resolves the extent to which the property interest is property of the estate.[51] The Tenth Circuit held in 2008 that Kansas does recognize that the use or control of property is, itself, a property interest, and extrapolated from that property interest the existence of a preference cause of action under § 547(b) when a debtor exercises dominion or control over the transferred property.[52]

But trying to apply the dominion/control scenario that is applicable in preferential transfer decisions to this case is difficult. The facts are not similar, and the Tenth Circuit has also held "that the transfer of property of another which has incidental effect upon the assets of a debtor" does not satisfy § 727(a)(2) in a situation where a debtor held a fifty percent interest in a corporation and the corporation transferred its assets to a subsidiary corporation.[53]

The better theory is found in the analogous case of *Freelife Int'l LLC v. Butler (In re Butler)*.[54] In that case, the debtors formed multiple corporations to operate their personal businesses; the debtors operated and controlled the bank accounts for

---

[50] *Parks v. FIA Card Servs. (In re Marshall)*, 550 F.3d 1251, 1255 (10th Cir. 2008).

[51] *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1197 (10th Cir. 2002).

[52] *In re Marshall*, 550 F.3d at 1255.

[53] *Mcorp Mgmt. Sols., Inc. v. Thurman (In re Thurman)*, 901 F.2d 839, 841 (10th Cir. 1990).

[54] No. UT-06-077, 2007 WL 866660 (10th Cir. BAP Mar. 19, 2007).

46

each, and were employed as consultants by the corporations but retained the power of attorney to act in the corporate name and to receive a percentage share of all income.[55] The debtors' children, however, were actually named as the corporate owners and officers.[56]

The bankruptcy court concluded that the debtors' children were the owners in name only, and that the corporate shell should be disregarded. That decision was affirmed by the Tenth Circuit BAP. The BAP found it important that the debtors treated the corporate property as their own and ignored the separate corporate status. It also held that "[w]hen a debtor disregards corporate formalities, transfers money freely and without legitimate reason between the corporations and the debtor, and uses a corporation for a fraudulent purpose, the debtor should not be permitted to hide behind the corporate veil and should be treated as the corporation's alter ego."[57]

The BAP also called it "well established" that property of a debtor "in the possession, custody and control" of the debtor's alter ego "comprises property of the estate at the commencement of the case," and that "bankruptcy courts have the power to disregard separate corporate entities so as to reach the assets of its non-debtor alter ego to satisfy debts of the debtor."[58] In conclusion, the BAP held:

---

[55] *Id.* at *4.

[56] *Id.*

[57] *Id.* at *5.

[58] *Id.* (internal quotations omitted)

47

> It is also a settled principle of law that when one legal entity is but an instrumentality or alter ego of another, by which it is dominated, a court may look beyond form to substance and may disregard the theory of distinct legal entities in determining ownership of assets in a bankruptcy proceeding. The basic policy underlying the alter-ego doctrine is to redress fraud or wrong perpetrated through an instrumentality.[59]

The BAP then confirmed that the controlling state law (in that case, Utah) also supported its conclusion, finding that in Utah, as long as there is unity of interest and ownership such that the separate personalities of the corporation and the individual no longer exist and that observance of the corporate form would yield an inequitable result, the corporate entity can be disregarded.[60]

The facts are similar here. Ron incorporated Image Motors in June 2010 with his silent 1% partner, Mr. Krigel, but then essentially operated as a sole proprietor, doing as he pleased from that point on. And he did not bother to adhere to corporate formalities when filing reports with appropriate authorities. For example, in the 2014 annual report Ron filed for Image Motors, he falsely certified that Image Motors did not hold greater than 50% equity ownership in any other business.[61] That was false because Image Motors owned 100% of Image Truck in 2014.

When Image Motors then "sold" Image Truck Partners to Todd, the purported Purchase Agreement was signed by Ron, both personally and as president of Image Motors. But Image Motors received no money from this sale; instead the

---

[59] *Id.* (internal quotations and alterations omitted).

[60] *Id.*

[61] Exh. 61 p.IM0070.

consideration was payable to Ron and Denise for "consulting fees" and Denise's clerk work. Mr. Krigel, the 1% owner, received nothing from the sale of his interest. Further, Denise had no ownership interest in Image Motors, but Ron and Todd structured the deal so she would receive $8,000 from the $64,000 sales price. Testimony further showed that while Ron and Todd then used Image Motors as a payroll office, and used Image Motors' dealers license, the family otherwise treated Image Motors and Ron as synonymous.

In addition, Ron used the name of Image Motors when it was convenient for him to do so, but not when it did not serve his purposes. For example, Ron listed Image Motors as his employer in his bankruptcy Schedules, even though he had not earned income from that entity for at least six months. And when it was helpful for him to say that he and Todd owned Image Truck Partners jointly, so customers of Image Truck Partners would agree to buy and sell trucks using the dealer's license held only in Image Motors' name, he allowed Todd to do so, even though it was completely false. Just like in *Butler*, Ron disregarded corporate formalities, transferred assets freely between entities and himself, and used the corporate form only for self-serving purposes. Again, these examples buttress the Court's decision to essentially disregard Image Motors' corporate form in deciding that Ron transferred Image Truck Partners postpetition, and failed to disclose Image Truck Partners as an asset in his bankruptcy schedules.

Kansas case law also supports disregarding Image Motors' corporate form and allowing the estate to reach its assets. In Kansas, when an individual "uses a

49

corporation merely as an instrumentality to conduct his own personal business" and then perpetrates fraud or injustice, then the alter ego theory may be used.[62]

This brings us to the third, and ultimate part of Creditor's claim under § 727(a)(2). Did Ron transfer Image Truck Partners to his son with the intent to hinder, delay, or defraud Creditor? The governing principles are well established. "Section 727(a)(2) requires actual fraudulent intent, and the bankruptcy court must delve into the mind of the debtor."[63] "Because rare is the occasion when a party lays bare his or her subjective intent, fraudulent intent may be established by circumstantial evidence, or by inferences drawn from a course of conduct."[64] Again, as in the § 522(o) claim above, courts look to the presence of "badges of fraud" to determine whether fraudulent intent is present.[65] After four days of trial testimony, the Court is convinced that once Ron and Todd realized they had not consummated the transfer of Image Truck Partners, Ron then transferred Image Truck Partners with every effort to conceal that transfer, and hinder and defraud Creditor.

---

[62] *Kilpatrick Bros., Inc. v. Poynter*, 473 P.2d 33, 42 (Kan. 1970). Because this Court finds that Ron/Image Motors transferred the assets of Image Truck Partners to Todd postpetition, this also means that Debtors' assertion on their Schedule A/B that Image Motors "has no assets or debts," Exh. 10, p.20, is also a false statement.

[63] *Rajala v. Majors (In re Majors)*, No. KS-04-093, 2005 WL 2077497, at *3 (10th Cir. BAP Aug. 29, 2005) (internal quotations omitted).

[64] *Mathai v. Warren (In re Warren)*, 512 F.3d 1241, 1249 (10th Cir. 2008) (internal quotations and alterations omitted).

[65] *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (10th Cir. 1997). See page 33, supra, for the ten badges of fraud set forth in *U.S. Trustee v. Garland (In re Garland)*, 417 B.R. 805, 815 (10th Cir. BAP 2009) and see attached Exhibit B for those shown here.

50

First, there is ample evidence of concealment. Ron apparently first learned that his holding of Image Truck Partners would create a problem when Todd told Image Truck Partners' bank, Mission Bank, that Ron was filing bankruptcy. Mission Bank insisted on having proper ownership records in its file, and that is apparently when Todd contacted the family's lawyer, Mr. Stein, who then created the purchase agreement in February, 2016. The draft Mr. Stein sent Todd contains this typed line: "THIS AGREEMENT is made this ___ day of May, 2015 . . ." even though the document was drafted in February of 2016.

Debtor or Todd filled in the day "29" so the document then said the agreement was made May 29, 2015. It also said, as its last line, that "the parties have signed this agreement the day and year first above written." This was false, and it was not until Creditor demanded metadata about that document during discovery that the fact the Purchase Agreement was created and signed postpetition came to light. Debtors, with the apparent help of counsel, engaged in this active transfer and cover up almost immediately after filing, in what the Court firmly believes was a deliberate attempt to get the asset to Todd, and to keep it from Debtors' creditors.

Second, Ron continued to use the asset—Image Truck Partners—even after the formal transfer as he had done all along: i.e., when it suited him best to do so. Ron had control of the company's bank account, with the ability to write checks on the account. And Ron and Todd ran Image Truck Partners as just that, a partnership. Ron and Todd represented to customers and the public that both

51

created the company and both ran the company—they were the "Partners" in Image Truck Partners. Nothing changed after the transfer, and Ron continued to draw income from Image Truck Partners just as he always did.

Third, the transfer of Image Truck Partners was to an insider, Debtors' son Todd. Ron, Todd, and Jeff all testified that it was Ron and Todd's intent from the beginning to transfer Image Truck Partners to Todd once Todd's own legal troubles abated. And perhaps they even thought they actually accomplished this in May 2015. But that belief isn't credible considering 1) Ron's more than forty years of business experience and observation of Arrow's business formalities, and 2) Todd's supposed concern over transferring the asset in 2015 because of the litigation with his prior employer. And regardless, the transfer to a family member makes the transfer more suspicious, not less.

Fourth, as detailed in the § 522(o) fraud section above, there is a significant pattern of sharp dealing with respect to Ron and hiding assets from his creditors. In addition, Ron testified that he took all his income in cash from May 2015 forward, in an effort to keep funds from Creditor. The weight of the evidence shows that Ron actively worked to keep money to support his luxury $8000 a month lifestyle, and to keep assets away from Creditor.

There are also too many other "coincidences" that are not easily explained. The journal entries "correcting" Image Truck Partners' books to reflect almost exactly $64,000, the same amount as the supposed purchase price, and straddling the alleged purchase date? The decision to backdate the Purchase Agreement to

52

May 29, 2015, the precise date Creditor obtained an order in aid of execution? The supposed meetings with accountants and attorneys who bill for their time, but had no record at all of these meetings?

Fifth, although there is no evidence that Debtors became insolvent as a result of the transfer of Image Truck Partners (because they were already insolvent), there is evidence that Image Truck Partners was making income, was a valuable asset, and was transferred to an insider postpetition for essentially no consideration. Again, although the evidence is conflicting about just how valuable the asset was, as will be detailed below, there is really no doubt that its value was high when compared to Debtors' income at the time.

As to the actual value at time of transfer, there was significant expert testimony concerning whether the transfer of Image Truck Partners was a gratuitous transfer of property. Creditor introduced the expert testimony of Julia Mast, a Certified Public Accountant since 2002, a Certified Fraud Examiner since 2008, and who was accredited in the area of business valuations.[66] Both parties' experts provided fair market valuations of Image Truck Partners as a going

---

[66] Ms. Mast is with BKD, LLP, a CPA firm with audit, tax, and accounting arms. Although Ms. Mast had never performed a valuation of a truck broker—and neither had Debtors' expert, she has valued businesses in many contexts, having done about thirty to fifty business valuations in her career.

Ms. Mast was handicapped in making her original computation of value because Debtors' counsel only provided limited financial records from Image Truck Partners and from only certain dates: December 31, 2014, May 31, 2015, December 31, 2015, and March 31, 2016. After requesting and receiving additional financial information, she was able to update her report to provide more accurate valuations based on the trailing twelve months' data. The Court will focus only on Ms. Mast's revised numbers from her updated report.

53

concern, which assumes that the current management will stay with the business into perpetuity.[67] Ms. Mast did not perform a site visit or talk to management from Image Truck Partners because of her role as Creditor's expert; she thus did not have the same access to information as Debtors' expert. Rather, she gained her knowledge of Image Truck Partners' business model from attorneys, the documents provided, and the business's website.

Regarding the Income Approach, Ms. Mast analyzed Image Truck Partner's assets and found they were common for the industry. Ms. Mast had to normalize her numbers for depreciation expense and executive compensation, which Image Truck Partners had not been deducting. She also had to make other control

---

[67] Both parties' experts used the same approaches: the Income Approach and the Market Approach. In the Income Approach, a valuation expert takes the net income/earning stream from the company's history and normalizes it, ultimately determining the company's cash flow. To "normalize" is to adjust for items that would not typically come with the business if it is sold to a new buyer. Only normal income and expenses are used: e.g., those that are related to the core operations of the business or that will go with the business to a new buyer. The cash flow is then multiplied by the capitalization rate, a percentage based on the risk of the company, how established the company is, etc. If an abnormal amount of cash is in the company on a certain valuation date, then the Income Approach may require the valuation expert to consider it as excess cash that needs added back in after the capitalization rate computation is completed.

In the Market Approach, the valuation expert relies on databases with actual transactions in the industry to get a multiple; that multiple is then applied to the company the expert is valuing. The expert must find a comparable company and then select the appropriate multiplier, such as gross revenue, gross profit, EBITDA (earnings before interest, tax, depreciation, and amortization), or EBIT (earnings before interest and taxes). Once the multiples are computed, the expert must decide whether to choose the mean, median, low, or high numbers, and then apply the appropriate number to the company being valued. Adjustments may then be needed, such as adding cash or taking away short term liabilities.

Both parties provided valuations as of May 29, 2015 and February 3, 2016. Because of the Court's prior conclusion that the transfer occurred on February 3, 2016, the Court will only discuss information relevant to that date.

54

adjustments for expenses the company was deducting but a purchaser would not pay for, such as Royals baseball tickets, repairs on personal vehicles, personal legal fees, and certain non-standard healthcare expenses.

Ms. Mast calculated Image Truck Partners' weighted average earnings before taxes as $104,577, i.e., this is what Image Truck Partners' earnings should be going forward. Ms. Mast applied a 3% growth rate to estimate Image Truck Partners' long-term growth rate for future earnings. After certain adjustments for taxes, capital expenditures, etc., Ms. Mast then applied a capitalization rate of 14.5% to her computation of the equity a buyer could expect to receive to determine the fair market value.

Ms. Mast assessed several factors before selecting the 14.5% capitalization rate. Some factors therein, such as the risk-free rate of return, are industry standard numbers. Other factors, such as the company specific premium and the discount rate, are determined based on the valuation expert's assessment of the length of history of the company, its profitability, its volatility, what is common in the industry, etc. Ms. Mast did not consider Image Truck Partners to be a start up or a risky company, because it had been operating almost two years by February 2016 and had already started to make a profit. Ms. Mast clarified that she was engaged to do a fair market valuation, not to determine if a venture capitalist would invest in the company.

Ms. Mast did not deduct any interest bearing debt from her valuation. Ms. Mast acknowledged that long term debt would be a reduction of value, but Ms. Mast

did not include the short term debt such as loans from Mr. Gortenburg or the line of credit because it is related to inventory and would not reduce value.

Regarding the Market Approach, Ms. Mast first defined Image Truck Partners' business model as "motor vehicles and motor vehicle parts and supplies," and assigned them an operating code within the truck industry. She then identified seven companies within the same operating code and compared those companies' financial statements to Image Truck Partners with data derived from Pratt's Stats. Both parties' experts used the same operating code and the same Pratt's Stats database information to classify Image Truck Partners.

Ms. Mast then compared Image Truck Partners' gross profit and EBITDA information to these companies, and used those companies' multiples to compute the fair market value of Image Truck Partners after adjusting for cash on hand and other assets. Ms. Mast testified that standard business valuation practice does not split companies into "stages" when valuing—as Debtors' expert did for his considerably lower value, but does consider the age of the company.

Ultimately, Ms. Mast opined that the value of Image Truck Motors on February 3, 2016, its date of transfer, was $403,000 using the Income Approach, and $474,500 using the Market Approach. Ms. Mast then applied a 10% discount for lack of marketability because Image Truck Partners is not a shareholder company, and as a result reduced her final valuation to $395,000.

When faced with choosing between two alternatives for various factors, Ms. Mast always chose the most conservative one (resulting in a lower value), and she

56

assumed all information provided to her by Image Truck Partners was accurate. To that end, regarding the irregular journal entries made on May 31 and June 1, 2015 that Todd was never able to explain, Ms. Mast testified that while industry standards required her to assume their accuracy, if the second of those "corrections" had not been made, Image Truck Partners would have had excess cash that would have increased her total valuation.

Debtors presented expert testimony from Jeff Johnson, a Chartered Financial Analyst[68] but without a CPA or accounting background. Before completing his valuation, he received monthly financial records for Image Truck Partners and conducted a management interview with Ron and Todd. From that interview, he concluded that Image Truck Partners had no infrastructure, had only one employee with industry experience, had no policies or procedures in place, had no contracts or customer lists, was a "first stage" business, and had one employee with no management experience who was also training someone else.

Regarding the Income Approach, the biggest difference between the two experts' valuation approaches was the capitalization rate each used. Mr. Johnson used a capitalization rate of 46.8% versus Ms. Mast's 14.5% capitalization rate. Mr. Johnson testified that he considered Image Truck Partners a "first stage" company,

---

[68]  Mr. Johnson is with Allied Business Group, LLC, a consulting firm "providing investment banking, valuation, forensic advisory, and business advisory services to privately held companies." Exh. 112 p.13. Mr. Johnson has valued businesses for about thirteen years, has valued over a hundred companies in his career he deems "early stage," but had also never valued a truck broker.

57

because Todd had only been operating it a short time, earnings had been volatile, and there had been many months with no profit. As a result, it was a riskier company and thus required a higher capitalization rate.

His expert report relied on three sources to claim that "venture capital rates" were appropriate for valuing Image Truck Partners;[69] his report states those sources "provide guidance on the rates of return expected by venture capital investors at various stages of [a company's] development."[70] But Mr. Johnson used studies from the 1980s and 1990s to arrive at a 50% discount rate, which Ms. Mast testified was not standard and was higher than anything she or the colleagues at her CPA firm had ever seen used in valuing a business. Ms. Mast believes the period of time for the studies upon which Mr. Johnson relied (1980s/early 1990s) was affected by the technology bubble, and venture capitalist activity, and that environment is thus not applicable nor appropriate in today's market and for this industry. Further, Ms. Mast looked through the studies Mr. Johnson cited, and indicated she could not find his rate therein, and the study she did find did not cite to a specific industry.

Ultimately, using the Income Approach, Mr. Johnson valued Image Truck Partners (effective February 3, 2016) at $115,700, and at $108,200 using the Market Approach. He then added in certain non-operating assets (in this case,

---

[69] Exh. 114 p.46.

[70] *Id.* p.13.

trucks on hand valued at $35,100) and subtracted total debt (in this case, a loan from Mr. Gortenburg of $94,500). Mr. Johnson testified that this was required because Image Truck Partners had purchased trucks but then had a sale fall through when the prospective buyer backed out. As a result, Mr. Johnson felt that a potential purchaser would not take that debt so he removed it from the value, but added in the value of the trucks that remained on hand. Mr. Johnson's final computation of value for February 3, 2016 was, therefore, $53,200, but then he testified based on his experience, Image Truck Partners would not have sold for any price in February 2016.

The Court finds Ms. Mast's assessment of value significantly more persuasive than Mr. Johnson's valuation. First, Ms. Mast's experience and credentials were simply more relevant to the task than Mr. Johnson's, and were frankly more impressive. Second, both experts used the same method to determine value for the Income Approach, but Mr. Johnson used a drastically higher capitalization rate, and one that was not customized. Further, he gave conflicting testimony about when such high discount rates were appropriate. He first stated that he would not use the high rates he used here when the company is not as risky or when the company has a positive net income, but then he also acknowledged that Image Truck Partners had a positive net income.

Debtors attempted to find fault with Ms. Mast's methodology, but the Court credits Ms. Mast's methodology overall, and especially her disagreement with Mr. Johnson's classification of Image Truck Partners as a first stage company. A first

59

stage company is pre-profit, meaning it is (typically) brand new and is not yet producing income. That does not fit Image Truck Partners' profile in February 2016.

Ron testified in March of 2016 at his § 341 meeting that Image Trucks had over $500,000 in revenue in 2015. Further, Exhibit 50 admitted at trial entitled "Todd's Sales History" (from when he was working in the same industry for Truck Center of America) showed Todd created $1.8 million in sales in 2013, with Todd's commission being $160,000 and another $520,000 profit going to Truck Center of America. Accordingly, the evidence shows that Image Truck Partners had considerable earning potential. Mr. Johnson seems to have ignored both the 2015 sales of Image Truck Partners and this earning potential when he labeled Image Truck Partners a first stage business, and it was this label that then led him to select a highly inflated discount rate.

In addition, like Ms. Mast, Mr. Johnson used the Income Approach for his valuation, but that is an approach that can only be used when there is income. By definition, a first stage company has no income, so the Income Approach could not be used for a true first-stage company. And while Mr. Johnson used a projected growth rate for Image Truck Partners that was essentially the same as that used by Ms. Mast,[71] that rate is actually used for companies in the second stage of growth, so Mr. Johnson's testimony was also inconsistent in this regard. Ms. Mast believes Image Truck Partners is at the end of its second stage, and that it is now moving

_____

[71] Mr. Johnson testified that Image Truck Partners was actually growing at a rate of 3.5%, and so his use of a 3.2% growth rate was appropriate.

60

into the growth stage, as it is becoming cash flow positive. These facts were demonstrated with her testimony and referenced exhibits.

And finally, the Court disagrees with Mr. Johnson's treatment of debt in his February 3, 2016 valuation. Mr. Johnson anticipated that Image Truck Partners would take a loss on certain trucks it had purchased and not sold, and guessed that this would cause the short-term debt to be transformed into long-term debt. Mr. Johnson testified that it was his opinion that a purchaser would not take on the debt and so it was appropriate to treat the amount as a lack of net working capital and subtract it from the enterprise value.

Ms. Mast, however, persuaded the Court this was an "extraordinary assumption" from Mr. Johnson—one that standard valuation procedure would require to be footnoted and explained (which Mr. Johnson failed to do), as debt for inventory is treated differently than long-term interest bearing debt. Further, the Court agrees with Ms. Mast that it was unrealistic for Mr. Johnson to assume that Image Truck Partners would take a loss on all the trucks at issue. At trial, he admitted he did not know what had happened with the rest of those trucks.

Although the Court ended up favoring Ms. Mast's qualifications and methodology in valuing the company, and thus trusted her valuation over Mr. Johnson's, the Court need not make a finding as to the exact value of Image Truck Partners when Ron transferred it to his son. What the Court must find, and it does, is that Ron transferred Image Truck Partners to Todd for considerably less than it was worth. The Court is therefore confident in concluding that the transfer of Image

Truck Partners was a gratuitous transfer of property to a family member, yielding the presence of yet another badge of fraud. "The more badges that are present, the more likely it is that the transfer has been made with intent to hinder, delay or defraud creditors."[72] Here, there are multiple badges present, as discussed above and outlined on Exhibit B.

And even without this overwhelming evidentiary support, "[i]ntent can be inferred from the surrounding circumstances, and the course of the debtor's conduct is also relevant. Reckless indifference to the truth, such as failing to list substantial assets or to promptly amend the schedules to list those assets, is considered the equivalent to intentional fraud under § 727(a)(2)."[73] Here, when Ron learned after filing that he had not transferred the Image Truck Partners asset in May 2015, instead of disclosing that fact to the Court and creditors, he undertook a course of action to transfer the asset postpetition, and then conceal that behavior. A short amendment to his Schedules to disclose the asset would have been easy; Ron chose to act otherwise.[74]

Debtors argue that Ron and Todd had a legitimate business purpose in transferring Image Truck Partners to Todd, since Todd was the one with business

---

[72] *Freelife Int'l, LLC v. Butler (In re Butler)*, No. UT-06-077, 2007 WL 8666660, at *5 (10th Cir. BAP Mar. 19, 2007).

[73] *Rajala v. Majors (In re Majors)*, No. KS-04-093, 2005 WL 2077497, at *3 (10th Cir. BAP Aug. 29, 2005) (internal quotations omitted).

[74] *Cf. Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir. 1997) ("[N]o inference of fraudulent intent can be drawn from an omission when *the debtor promptly* brings it to the court's or trustee's attention *absent other evidence of fraud*.").

62

experience in the truck industry and he had early on articulated he wanted to own his own company. And yes, the Court recognizes that the transfer of assets for legitimate business purposes does not support a finding of fraudulent intent. Neither do arms-length transactions.[75] But that was not what happened here, as the facts clearly demonstrate.

Debtors' only other argument is that they tried twice to settle their debt with Creditor over eight years ago, and also voluntarily participated in the 2011 debtor's exam, produced some documents, and even allowed Creditor access to inventory their home in 2015. They conclude from those minimal efforts that the Court should find they could not possibly have been trying to hinder, delay, or defraud Creditor. The Court struggles to see how the above described settlement attempts demonstrate anything, especially since the first offer was to turn over Arrow inventory, and the second was to turn over used cars worth less than 20% of the judgment. But even if these offers were relevant, the Court does not find that Creditor's decision to reject offers to settle for considerably less than its judgment somehow excuses Debtors' actions.

The Court finds that Creditor has carried its burden of proof to show that Ron should be denied a discharge under § 727(a)(2)(B).

2.     **Section 727(a)(4)(A)**

Creditor moves for the denial of the discharge of both Debtors under §

---

[75] *Id.* at 1293–94.

727(a)(4)(A). "In order to deny a debtor's discharge pursuant to [§ 727(a)(4)(A)], a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made [a false] oath and that the oath relates to a material fact."[76] Specifically, Creditor "must show that (1) debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently."[77] Section 727(a)(4)(A) "sanctions debtors who deliberately fail to make proper disclosures, and is intended to ensure that dependable information is supplied to interested parties so they can rely on it without having to uncover true facts through investigation."[78] "[A]n omission of assets from a Statement of Affairs or schedule may constitute a false oath under section 727(a)(4)(A)."[79]

Creditor alleges several false oaths from Debtors in connection with their bankruptcy filing: 1) failing to disclose the existence of the Image Truck Partners asset, which the Court has found Ron owned on the petition date and which had considerable value; 2) claiming the transfer of Image Truck Partners occurred June 1, 2015, when it legally occurred postpetition; 3) failing to disclose Debtors' employment with, and income from, Image Truck Partners; 4) Ron's failure to

---

[76] *Id.* at 1294.

[77] *Davis v. Weddington (In re Weddington)*, 457 B.R. 102, 111 (Bankr. D. Kan. 2011).

[78] *Bailey v. Ogden (In re Ogden)*, No. UT-98-042, 1999 WL 282732, at *7 (10th Cir. BAP Apr. 30, 1999).

[79] *Job v. Calder (In re Calder)*, 907 F.2d 953, 955 (10th Cir. 1990).

64

disclose his role as Vice President of Image Truck Partners; and 5) Debtors' failure to disclose a preferential payment to a credit card company. The Court would also add Ron's testimony at his § 341 hearing that he received all the Keystone settlement proceeds and did not route it through third parties for safekeeping, when the fact is all the money was routed through third parties.

As an aside, Creditor is also correct that even if the Court believed Ron's story that he really meant to effectuate the transfer of Image Truck Partners to his son effective June 1, 2015 (and it didn't get done because Todd neglected to follow up after he asked his attorney to draft the purchase agreement), that version of the events would result in another false statement on the Schedules. Specifically, Question 18 on the Statement of Financial Affairs asks debtors to disclose "[w]ithin 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than . . . in the ordinary course of your business."[80] Debtors disclosed a $7,322 jewelry sale two months before bankruptcy to a company owned by Debtors' friend Mr. Kriegel—the same person who was the 1% owner of Image Motors—but omitted the far more significant transfer of an ongoing business, without consideration, to his own son.

Ron quibbles that he did not have to make this disclosure because he, as an individual, did not own Image Truck Partners (i.e., because the non-filing entity, Image Motors owned it). But the Court has found that Ron effectively was the

---

[80] Exh. 10 p.12.

owner. Thus, he should have disclosed his interest in Image Truck Partners somewhere on these schedules, regardless when the transfer was made.

Creditor has easily carried its burden of proof to show false oaths made in connection with Debtors' case. As a preliminary matter, the Court does not find Ron's testimony credible that he thought he transferred Image Truck Partners in May 2015. Ron is a sophisticated, college educated, business person with a 30-year history of running a multimillion dollar company. Someone with his business acumen would not believe that an entire business could be transferred by simply having a meeting with his accountant to discuss a transfer. Yet he did absolutely nothing to effectuate this alleged transfer.

Because Image Truck Partners had not been legally transferred as of the date of bankruptcy, Ron was required to disclose that asset on the Schedules. For example, Ron should have disclosed his connection with Image Truck Partners in response to Question 4 on the Petition where it asks the debtor to disclose "[a]ny business names . . . you have used in the last 8 years."[81] And on Debtors' SOFA when it asks them to explain the sources of any income and specifically provides a box to check if the income was from "operating a business" from January 1 to December 31, 2015,[82] Ron did not check the box indicating his income was from the operation of a business, even though he had operated both Image Motors and Image

---

[81] *Id.* p.2.

[82] *Id.* p.8.

Truck Partners during that time period.

Another place where Ron should have disclosed his connection to Image Truck Partners was in Part 11 of the SOFA, which very broadly requires debtors to "Give Details About Your Business or Connections to Any Business."[83] Clearly Ron had a "connection" to Image Truck Partners even if he did not think he owned it on the date of petition (and legally, he did). And Question 27 that immediately follows that general heading requires disclosure of any connection to a business "within 4 years before you filed for bankruptcy," and provides several possible choices, including certain check boxes. Debtors only listed Image Motors, and implied it was still operating by stating it had been in existence from "6/9/2010 to present."[84] Conspicuously absent is any reference to Image Truck Partners.

The Court was not impressed with the eye of the needle through which Debtor's counsel tried to thread Ron's testimony on this question, noting that at least one of the discrete questions asks if Debtors are "[a]n officer, director, or managing executive [within the prior 4 years] of a corporation,"[85] then stressing that Image Truck Partners was not a corporation, but a limited liability company so Ron did not need to disclose he was its Vice President. This argument might have been availing if Ron had then responded honestly to the other questions. But he did not.

---

[83] *Id.* p.14.

[84] *Id.* p.14–15.

[85] *Id.* p.14.

67

Remember, Ron had filed a report with the Kansas Secretary of State, before the bankruptcy and under penalty of perjury—in March of 2015—claiming that both he and Denise were the only members of Image Truck Partners.[86] Debtors' SOFA specifically requires debtors to check a box if they are a "member of a limited liability company," and neither Debtor checked that box, either.[87]

Even if the Court could find that Denise was not a sophisticated business person and did not understand these business nuances, the Court can think of no justification why both she and Ron failed to disclose that their only source of income when they filed bankruptcy was from Image Truck Partners, instead stating on Schedule I that their income was from Image Motors.

Ron provided further evidence that this misrepresentation regarding the source of their income was intentional when he continued to insist at trial that because the checks he received from work done at Image Truck Partners were written using the pay master account for Image Motors—a business that had not been operating for at least six months, and likely longer—that meant his employer was actually Image Motors. Embracing and trying to sell that story further reduced his credibility.

And Denise claimed she went through the bankruptcy schedules with her attorney line by line, but still misrepresented what entity she was actually working

---

[86] Exh. 63.

[87] Exh. 10 p.14.

for in January of 2016. Debtors own a $1.2 million home and need $8000 a month to meet their household needs. They well knew their income was not coming from Image Motors.

Creditor argues that Debtors attempted to "whitewash" their Schedules so no one would discover that Ron either still owned Image Truck Partners on the date of petition, or had recently sold it to a family member without adequate consideration. This "whitewash" charge appears to be true.

Finally, Debtors admit that a $12,830 payment was made on one of their credit cards just prior to filing, but that the payment and the source of the payment was omitted from disclosures of payments made on Debtors behalf on their SOFA. That SOFA specifically required Debtors to list any creditor to whom they (or anyone on their behalf) paid more than $6,225 in the 90 days prior to filing.[88] If this was the only omission, the Court might consider it accidental due to its proximity to the filing date. But it is not close to the only false statement or omission on the Schedules or in connection with the case.

Regarding materiality, the "existence and disposition of [a debtor's] property" is a material matter.[89] In addition, a matter is considered material "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his

---

[88] *Id.* p.9.

[89] *Job v. Calder (In re Calder)*, 907 F.2d 953, 955 (10th Cir. 1990).

property."[90] Again, Creditor has carried its burden to show materiality. Debtors failed to disclose the source of their income, their business interests, the scope of their assets, and a large preferential payment. It is hard to imagine more material facts in bankruptcy.[91]

Regarding whether the false oaths were knowingly made, both Debtors' testimony at trial was conflicting, and, therefore, the Court did not find either credible. For example, regarding their employment and source of income at filing, Denise gave entirely different answers at times. She both testified that she was not employed at filing and did not know the last time she received a paycheck, *and* that she was working for her husband but did not know for which business entity. She claimed to know nothing about almost any financial matter, but also testified that she took care of the household bills.

Ron's testimony was even less credible. Ron first testified that Image Motors was his employer, then changed to state that Image Truck Partners was his employer, and finally landed on what appears to be the truth: that Image Motors is the pay master on his checks, but that his pay is derived from Image Truck Partners. The same scenario played out with respect to Ron's failure to disclose his role as an officer of Image Truck Partners. He claimed he did not disclose Image

---

[90]  *In re Chalik*, 748 F.2d 616, 618 (11th Cir.1984).

[91]  *See Davis v. Weddington (In re Weddington)*, 457 B.R. 102, 112 (Bankr. D. Kan. 2011) ("The omission of [a debtor's] job and attendant income is material. A fact is material if it bears a relationship to the debtor's business transactions or estate, concerns the discovery of assets or the existence and disposition of the debtor's property, or detrimentally affects administration of the estate").

70

Truck Partners because Image Motors owned the asset, not him, but he never explained why he did not disclose his connection to the business, including being a member of the LLC. "A debtor acts knowingly if he or she acts deliberately and consciously."[92] And the bottom line here is that both Debtors gave false information in support of their bankruptcy filing, after admitting that they had carefully reviewed it with attorneys prior to filing.

And finally, regarding intent to defraud, much like the analyses above, "[t]he problem in ascertaining whether a debtor acted with fraudulent intent is difficult because, ordinarily, the debtor will be the only person able to testify directly concerning his intent and he is unlikely to state that his intent was fraudulent. Therefore, fraudulent intent may be deduced from the facts and circumstances of a case."[93] "Again, the bankruptcy court can infer fraudulent intent from the surrounding circumstances, and reckless indifference to the truth is the equivalent to actual fraudulent intent."[94]

For nearly the same reasons as stated above, the Court finds that Creditor has carried its burden to show intent to defraud by Debtors from the making of false oaths. The Court is convinced that Debtors were attempting to hide their involvement with Image Truck Partners from Creditor and the Trustee. Debtors

---

[92] *Id.*

[93] *In re Calder*, 907 F.2d at 955–56.

[94] *Rajala v. Majors (In re Majors)*, No. KS-04-093, 2005 WL 2077497, at *3 (10th Cir. BAP Aug. 29, 2005).

71

had to know that Creditor (or the Chapter 7 trustee) would actively seek to pursue that business if it was disclosed, and wanted to prevent that result. Instead, they wanted their son, Todd, to keep the business because it is that business that has generated enough profit to support both Todd and to pay their monthly living expenses.

Debtors argue that they honestly answered all questions in their bankruptcy and made no false oaths. And it is certainly true that "[a] debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence. Moreover, an honest error or mere inaccuracy is not a proper basis for denial of discharge."[95] But Debtors did not make a mistake here; they hid information in their filing, continued to try and hide it after filing through the transfer of assets, and continued to obfuscate the facts at their § 341 meeting of creditors, including Ron's testimony about the Keystone settlement. The fact that Debtors elected to make a formal correction of only one of many errors (the correction of Ron's interest in Image Motors from 90% to 99%) is more evidence to this Court that Debtors chose to engage in fraud, and were not merely mistaken.[96]

The Court finds that Creditor has carried its burden of proof to show that both Debtors should be denied a discharge under § 727(a)(4)(A).

---

[95] *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294–95 (10th Cir. 1997).

[96] *Cf. Id.* at 1295 ("The fact that a debtor comes forward with omitted material of his own accord is strong evidence that there was no fraudulent intent in the omission. . . . A debtor that comes forward in order to inform the bankruptcy trustee of errors in the filings would not seem to be engaged in a 'pattern of non-disclosure' absent other indicia of fraud.").

### 3. Section 727(a)(5).

"Under § 727(a)(5), a bankruptcy court has broad power to decline to grant a discharge where the debtor does not adequately explain a shortage, loss, or disappearance of assets."[97] "Section 727(a)(5) requires a satisfactory explanation which must consist of more than vague, indefinite and uncorroborated assertions by the debtor."[98] The United States Court of Appeals for the Tenth Circuit has not set forth a standard for determining what constitutes a "satisfactory explanation" of loss of assets under § 727(a)(5). Other courts have determined that such a finding is left to the sound discretion of the court. Multiple circuits require some corroboration of a debtor's testimony as to the loss or disposition of assets. Other circuits and bankruptcy courts have held that explanations of a debtor's circumstances in general terms, that merely suggest reasons for the loss of assets, fall short of the mark.[99]

In addition, "no requirement exists that debtors act fraudulently or intentionally to sustain an objection to discharge based on Section 727(a)(5). On the other hand, when deciding whether a debtor's explanation is satisfactory for

---

[97] *Cobra Well Testers v. Carlson (In re Carlson)*, No. 06-8158, 2008 WL 8677441, at *5 (10th Cir. Jan. 23, 2008) (internal quotations and alterations omitted)

[98] *Id.*

[99] *Martinez v. Sears (In re Sears)*, 565 B.R. 184, 192 (10th Cir. BAP 2017); *see also* 6 *Collier on Bankruptcy* ¶ 727.08 at 727–45 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("A satisfactory explanation has not been definitively defined, but the debtor probably must explain the losses or deficiencies in such a manner as to convince the court of good faith and businesslike conduct. However, lack of wisdom in the debtor's expenditures, by itself, is not grounds for denial of discharge.").

73

purposes of Section 727(a)(5), the issue is whether the explanation satisfactorily describes what happened to assets; not whether what happened to assets was proper."[100] "A party objecting to a debtor's discharge under § 727(a)(5) has the burden of proving facts establishing that a loss of assets occurred. The burden then shifts to the debtor to explain the loss of assets in a satisfactory manner."[101]

Creditor's allegations on this count are very cursory. The pretrial order states the issue of fact as whether Debtors failed to explain Ron's "transfer of 99% of his indirect ownership interests in Image Truck, and their use of the Keystone settlement proceeds."[102] Creditor's Trial Brief then asserts that the following qualify as a "failure to explain loss of assets:" 1) Debtors' initial failure to explain that Image Truck Partners transfer documents were backdated, and 2) Ron's false testimony during his § 341 meeting that he paid his mortgages directly and no third parties held any Keystone settlement funds.

Creditor's allegations, however, do not fit a § 727(a)(5) claim. Section 727(a)(5) is for claims regarding missing assets:

> The objecting creditor bears the initial burden of identifying the missing assets by showing that the debtor at a time not remote in time to case commencement, had assets that would belong to the estate and that on the date of the petition he no longer had those assets. . . . A cause of action advanced under § 727(a)(5) is not a substitute for one based upon alleged pre-petition fraud, conversion or other malfeasance. Rather, its

---

[100] *In re Carlson*, 2008 WL 8677441, at *5 (internal quotations and alterations omitted).

[101] *In re Sears*, 565 B.R. at 189.

[102] Doc. 94 p.13.

purpose is to deny a discharge to a debtor who refuses to cooperate with the trustee or creditors in their effort to trace property that should have been part of the estate.[103]

In the case quoted, the court concluded that an alleged loss of assets occurring ten years, seven years, and six years prior to the bankruptcy was too remote in time to qualify under § 727(a)(5), and that "there was no mystery as to what became of the [alleged missing] assets."[104]

The same problems arise with Creditor's § 727(a)(5) claim here. Creditor appears to be trying to use this claim as a substitute for the already stated and analyzed claims based on fraud. In addition, the claim based on the Keystone settlement is also based on facts that are too remote. Like the case quoted above, Creditor has identified no assets that, just-prior to case commencement, were lost or disappeared.

The Court finds that Creditor has not carried its burden of proof to show that Debtors should be denied a discharge under § 727(a)(5).

## III.  Conclusion

Exemption planning (in or outside of bankruptcy) is absolutely appropriate, and transferring assets at arms-length can also pass muster. But hiding cash by laundering it through friends, back-dating documents in an attempt to memorialize an event that plainly did not happen in the past, and generally obfuscating a

---

[103] *Straub v. Straub (In re Straub)*, 192 B.R. 522, 525 (Bankr. D.N.D. 1996).

[104] *Id.* at 525–26.

75

creditor's collection efforts is not acceptable bankruptcy estate planning. Neither is lying on bankruptcy schedules, or while testifying in connection with that bankruptcy proceeding.

Creditor's objection to Debtors' homestead exemption[105] is granted as to Ron and denied as to Denise. Creditor's claim against Ron under § 727(a)(2)[106] is granted. Creditor's adversary claim against both Debtors under § 727(a)(4)[107] is granted. Finally, Creditor's claim against both Debtors under § 727(a)(5)[108] is denied.

**It is so Ordered**.

### # # #

---

[105]  Case No. 16-20079 Doc. 44.

[106]  Adv. No. 16-6048 Doc. 1.

[107]  Adv. No. 16-6048 Doc. 1.

[108]  Adv. No. 16-6048 Doc. 1.

## Exhibit A—Timeline

Although this timeline does not capture every relevant date to the *Holley v Coppaken* dispute, it is intended to capture key events to show their interconnectivity. These events are incorporated by reference into the Court's decision:

| | |
|---|---|
| 1985 | Ron takes over Arrow Speed Warehouse from uncle and builds it from $10 to $85 million company over 30 years, operating in 7 locations with 320 employees |
| 1996 | Debtors build $800,000 luxury home |
| 2005 | Beginning of decline of Arrow's specialty auto parts business industry |
| September 1, 2006 | Debtors obtain $800,000 loan at a 9.25% variable interest rate with M&I Bank, and pledge second mortgage on home |
| October 2008 | Holley Performance sues both Debtors on personal guaranty of Arrow debt |
| November 2008 | Arrow files Chapter 11 bankruptcy and thereafter business is sold to Keystone |
| April 2, 2010 | Ron sues Keystone for breach of employment contract |
| March 23, 2010 | Holley awarded $317,891 judgment against Debtors |
| June 2010 | Ron forms Image Motors to sell high-end used luxury vehicle sales, with himself as 99% owner and Scott Krigel as 1% owner |
| November 2, 2010 | Holley awarded $128,595 attorney fees and $7,469 costs; total debt owed by Debtors to Creditor is $453,955 plus interest at 12% |
| September 1, 2011 | Holley conducts debtor's exam of Ron to collect debt |
| October 21, 2011 | M&I Bank files foreclosure on its second mortgage and Debtors (through now-bankruptcy counsel) vigorously defend |

| January 17, 2012 | By this date, Ron has informed accountant and friend, Mr. Slabotsky, that Keystone settlement probable, has sought his assistance in buying out M&I Bank's second mortgage to stop foreclosure, and Mr. Slabotsky has commenced negotiations with his contacts at M&I Bank |
|---|---|
| January 25, 2012 | M&I Bank agrees to sell its then $698,611 debt for $254,000; Chase is owed approximately $670,000 on its first mortgage at this point |
| February 13, 2012 | M&I Bank assigns its second mortgage to GTMI (owned by Mr. Gortenburg); finalized but not dated until February 22, 2012 |
| March 13, 2012 | Ron assigns up to $1.2 million of anticipated Keystone settlement to GTMI and grants GTMI security interest, which GTMI does not record until March 22, 2012 |
| March 27, 2012 | Closing on Keystone settlement with Ron to receive $1.5 million, minus attorney fees and expenses. Ron directs payment from his $982,620 share as follows: $20,000 to now-bankruptcy attorneys Evans and Mullinix, $15,000 to CBIZ for future accounting work, $20,000 to BCGG business that Ron/Denise own, and the remainder $927,620 to GTMI |
| April 9, 2012 | Keystone litigation dismissed; first time any public record suggesting Ron might have received settlement money |
| April 13, 2012 | GTMI records assignment of M&I Bank's second mortgage dated almost two months earlier (on February 22, 2012) |
| June 20, 2012 | Ron asks Mr. Gortenburg for $672,523 of the $927,620 settlement funds paid to GTMI to pay off the Chase first mortgage; Ron delivers check to Chase |
| March 2013 | Creditor renews its judgment in state court |
| January 2014 | Todd comes to work at Image Motors after being fired from, and sued by, Truck Center of America for violating non-compete agreement |
| March 6, 2014 | Original Image Truck Partners Operating Agreement stating Image Motors is its sole member |

| | |
|---|---|
| May 6, 2014 | Mr. Gortenburg pledges $250,000 CD at Mission Bank to secure line of credit for Image Truck Partners |
| August 2014 | Todd reaches settlement with Truck Center of America requiring him to not solicit its customers through July 31, 2015 |
| March 2015 | Ron begins working full time for Image Truck Partners and has moved business because no longer needs space for cars previously sold via Image Motors |
| March 25, 2015 | Ron signs 2014 annual report for Image Truck Partner, stating under penalty of perjury that he and Denise are its sole members |
| May 26, 2015 | Creditor reappears for first time in 2 years; files garnishment orders |
| May 29, 2015 | Holley obtains order requiring renewed debtors' exam |
| *Also* May 29, 2015 | Date to which Purchase Agreement is backdated when actually signed February 3, 2016 |
| May 31, 2015 | First ledger "correction" Journal Entry for Image Truck Partners' books ($324,250) |
| June 1, 2015 | Second ledger "correction" Journal Entry for Image Truck Partners, reinstating the $324,250 asset |
| ALSO June 1, 2015 | Date Ron testifies (at § 341 meeting) that Image Motors sold Image Truck Partners to Todd |
| July 31, 2015, | Mr. Gortenburg loans Image Truck Partners $672,000 based only on a phone call; no note or other security required |
| by August 7, 2015 | Mr. Gortenburg had also loaned $297,500 to Image Truck Partners with no note or other security required |
| August 18, 2015 | Debtors provide documents to Creditor in lieu of debtors' exam, but produce nothing regarding Keystone settlement or alleged May 2015 transfer of Image Truck Partners during relevant time period |

| | |
|---|---|
| December 16, 2015 | Debtors (or someone on their behalf) pay unsecured credit card debt of $12,830.03—within 90 days of bankruptcy and in excess of $6,225 amount required to be reported; not reported |
| January 2016 | Creditor files Motion to Compel in state court collection matter seeking responses to document requests |
| January 25, 2016 | Debtors file bankruptcy, Case No. 16-20079-7 |
| February 1, 2016 | Todd receives draft Purchase Agreement from family lawyer Mr. Stein after Mission Bank requires ownership documentation for Image Truck Partners |
| February 3, 2016 | Purchase Agreement between Image Motors and Image Truck Partners actually signed |
| March 1, 2016 | Ron falsely testifies at § 341 meeting of creditors that net Keystone settlement went to him and none went to third parties; falsely testifies all but $25,000 proceeds used to pay mortgage creditors |
| March 3 and 16, 2016 | Todd notifies third parties that Image Truck Partners and Image Motors (which had effectively ceased operating by March 2015) were owned by both Todd and Ron to clear up dealer's license problem with customers |
| April 2016 | Ron files 2015 annual report for Image Truck Partners, again stating under penalty of perjury that he and Denise are its sole members |
| July 5, 2016 | Debtors make one (and only one) correction to their bankruptcy filing, noting Ron in fact was a 99% (not 90%) owner of Image Motors |

**Exhibit B**

**Summary of actions or statements that satisfy the Badges of Fraud**
(incorporated by reference into the Court's decision)

1.  Ron routed very large Keystone settlement proceeds ($927,620) through his friend's company for safekeeping until could pay down mortgages (and prepaid some expenses) and never explained to Court's satisfaction why he went through all those hoops. (Concealment of prebankruptcy conversion, conversion of assets before filing of bankruptcy petition, conversion of property after entry of a large judgment against the debtor, large monetary value of the assets converted.)

2.  Debtors retained their home after Ron paid $927,620 to increase equity in it. (Continued use by the debtor of transferred property.)

3.  Ron made sure nothing was recorded in the public record that could have alerted Creditor (who only a few months earlier had held a debtor's exam) that Ron was going to receive this significant settlement until *after* the money was diverted to GTMI. (Pattern of sharp dealing.)

4.  Ron prepaid future expenses out of his settlement instead of keeping it and subjecting it to possible garnishment, including $15K to CBIZ for future tax work and $20K to Debtors' corporation, BCGG. (Pattern of sharp dealing.)

5.  Debtors agreed in June 2015 to provide documentation of "cash or assets transferred to or from you" and of "any business owned or operated by you" for the period September 2011 through June 2015, but did not disclose any documents about the Keystone settlement money or the purported sale of Image Truck Partners only a month earlier. (Concealment of prebankruptcy conversion, pattern of sharp dealing.)

6.  Ron and Todd backdated the Image Truck Partners Purchase Agreement to May 29, 2015, while undisputed metadata received during discovery reveals document was not drafted until February 1, 2016, and they selected May 29—the same date Holley sought a renewed debtor's exam. (Pattern of sharp dealing.)

7.  Ron sells Image Truck Partners to his son, an insider, for far below fair market value. (Conversion of assets, gratuitous transfer of property, transfer to family member.)

81

8.   Ron and Todd represent to public that they are co-owners of Image Truck Partners in March 2016, and Ron still has access (and check-writing authority) to Image Truck Partners' bank account. This is evidence that Ron continues to use Image Truck Partners after the transfer, telling customers of Image Truck Partners that he remains one of its owners and is its Vice President. (Continued use by the debtor of transferred property.)

9.   Ron and Todd essentially alter the Image Truck Partners books to reflect $63,969 in the account on the date Ron testifies the business was sold, within $31 of the $64,000 agreed on purchase price, by authorizing their bookkeeper to make, then reverse two days later, a $324,250 journal entry, and neither Ron nor Todd can adequately justify these entries. (Pattern of sharp dealing.)

## Summary of False Statements or Omissions

10.  Ron discloses in bankruptcy that he is 90% owner of Image Motors when he is actually 99% owner. Later corrected.

11.  Ron and Denise claim their employer (on date of petition) is Image Motors, when neither has done work for that entity since at least March 2015. Conversely, when Ron is asked the same question two months later at his § 341 meeting who his employer is, he without hesitation answers Image Truck Partners.

12.  While Ron had filed the annual 2014 Image Truck Partners annual report, which he signed under penalty of perjury, on March 25, 2015, and claimed he and Denise were the only members of that entity, neither disclosed that membership interest, as required by their SOFA.

13.  Denise testified she was never an owner of any of Ron's businesses, but the SOFA she signed under penalty of perjury says she is 1/3 owner of BCCG, and Ron reported she was a member owning greater than a 5% interest in Image Truck Partners when he filed two reports, under penalty of perjury, with the Kansas Secretary of State.

14.  Ron lied repeatedly at his § 341 meeting regarding the Keystone settlement distribution.
    a.   Falsely testified his $975,000 (when actually was $982,620) was wired to "an account that [he] had;"
    b.   Falsely testified that none of the funds were given to third persons for safekeeping. All the money was actually given to third parties;
    c.   Falsely testified that all but $25,000 of the money was used to pay down mortgages, but $55,000 went to pay other debt or to prepay

future expenses.

15. Ron lied at his § 341 meeting regarding when he started working for Image Truck Partners/his son. The questioner asked if Ron started working "for your son at the time of the sale" (which he had just said was June 1, 2015); Ron's answer was "yes," when he had in fact been working for Image Truck Partners since March 2015.

16. Ron failed to disclose in his SOFA his business connection with Image Truck Partners within 4 years of bankruptcy. The SOFA specifically asks if he is a member of an LLC, and Ron previously filed reports with the Secretary of State stating he and Denise were the only members of Image Truck Partners for the 2014 and 2015 reports.
   a. Also failed to disclose he is Vice President of Image Truck Partners because the question arguably only requires disclosure if one is an officer or director of a "corporation" and Image Truck Partners is an LLC and not a corporation; overall question asks about any business connections.

17. Debtors failed to list Todd as a co-Debtor on Schedule H on their guaranty at Mission Bank. Ron testified twice that Todd is a co-Debtor/co-guarantor.

18. If Ron sold Image Truck Partners before bankruptcy, as he wanted everyone to believe by backdating the Purchase Agreement to May 29, 2015, he failed to disclose that sale, as he was required to in responding to the SOFA: "within 2 years before bankruptcy, did you sell, trade, or otherwise transfer any property . . . ."

19. Failed to list $12,830 payment to Southwest Air credit card made within 90 days of bankruptcy, as required by the SOFA: "list any creditor paid $6225 or more in last 90 days."

20. Ron filed 2014 Image Motors annual report in April 2015 and as of that date, certified that Image Motors did not hold more than a 50% equity ownership in any other business; trial evidence shows that Image Motors was the 100% owner of Image Truck Partners in 2014. This also shows Ron disregarded corporate formalities when it suited him.